**Marion J. CRAWFORD, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 8309.

District of Columbia Court of Appeals.

Argued Oct. 16, 1975.

Decided Feb. 16, 1977.

W. Gary Kohlman, Public Defender Service, Washington, D. C., for appellant.

Bette E. Uhrmacher, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Stuart M. Gerson, Lawrence H. Wechsler, and Edward C. McGuire, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before YEAGLEY, HARRIS and MACK, Associate Judges.

YEAGLEY, Associate Judge:

Appellant was convicted, after a jury trial, of (1) carrying a pistol without a license, D.C. Code 1973, § 22–3204, (2) receiving stolen government property, § 22–2207, and (3) altering identification marks on a weapon, § 22–3212. Appellant does not challenge the sufficiency of the government's evidence or raise any other issues arising from the trial itself. The issues on appeal are (1) whether the police could properly detain the car in which appellant was riding as a passenger in order to check the driver's credentials with the WALES (Washington Area Law Enforcement System) computer and (2) whether the police had probable cause to arrest appellant and order him to exit the car. The gun involved was in plain view after appellant vacated the car. We affirm the convictions.

Appellant was a passenger in the front seat of a two-door, bucket seat 1968 green and black Chevrolet Camaro. At approximately 3:45 p. m. on May 26, 1972, two police officers on scooter patrol saw the car occupied by appellant and three other men

make a "fast left turn" and fail to yield the right of way to oncoming traffic.[1] The officers stopped the car and asked to see the driver's license and the car's registration. The driver produced his valid driver's license; the car registration produced was valid, but the name on the registration differed from the name on the driver's license.

Even though the officers believed that the driver had the owner's permission to borrow the car, one of the officers radioed the dispatcher to check both the driver's name and the car owner's name through the WALES computer and to determine whether the car was stolen. Both officers testified that when a car's registration is in a name different than the driver's license, it is "usual procedure"[2] to check the discrepancy with the WALES computer. Officer McMullen radioed WALES and

received a response that the vehicle was an entered vehicle, which is normally

taken to mean stolen—not necessarily stolen. It means that the vehicle is wanted for some reason or other.

The car was wanted in connection with an armed robbery and sodomy offense that had occurred six days earlier.[3]

It is important to understand exactly what the officers knew after receiving the WALES information for it is on the basis of that knowledge that the officers arrested the car's occupants and ordered them out of the car and upon that knowledge that the propriety of their actions must be tested.[4]

Officer McMullen testified that after receiving the WALES information, he

recalled that [he] had received information in roll call a couple days before—I can't remember the exact amount of days ["I do remember hearing about it in roll call maybe two or three times."]—that the vehicle was wanted for a rape, rob-

---

1. Appellant places undue emphasis on the fact that the failure to yield the right of way was never written down on the police report as a reason for stopping the car. All parties agree that the "fast left turn" drew the police officers' attention to the car; thus more is initially involved here than the routine "spot check" stop upheld in *Palmore v. United States*, D.C.App., 290 A.2d 573, 582 (1972), *aff'd on other grounds*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). The omission from subsequent reports of the failure to yield the right of way violation is not determinative.

2. *See generally* D.C. Metropolitan Police Department Operational Handbook § 303.1, at 5 (Traffic Enforcement) (revised June 4, 1976) and § 304.10, at 10 (Police-Citizen Contacts, Stops, Frisks, and Motor Vehicle Spot Checks) (revised March 11, 1976).

3. There is some confusion about what information Officer McMullen received from WALES. The dispatcher "at first, said that the car was stolen [but] that was a mistake from the dispatcher." However, the dispatcher also reported that the car "was wanted in a robbery and sodomy case that happened a few days prior." It was on the basis of this subsequent report that the officers concluded that the car was in fact wanted by the police department.

Appellant also contends that the subsequent report only stated that the *owner* of the car was wanted in connection with the prior robbery/sodomy. To support this, he cites pages 48–49 of the Suppression Hearing Transcript. That reference does not support appellant. Officer McMullen testified that a *car* could be wanted in two ways:

It's according to the circumstances of the robbery. If the robbery occurred on the car [*sic*], then the car itself would be wanted. If the person involved in the robbery only used the car to make an escape, then the car would only be wanted because of the owner or the operator.

The conclusion is inescapable that, in Officer McMullen's words "the vehicle [was] wanted for some reason or other." Moreover, Officer Conway testified that both the car *and* its owner were wanted in connection with the robbery and sodomy case.

4. *Patterson v. United States*, D.C.App., 301 A.2d 67, 69 (1973), *quoting Jackson v. United States*, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962); *Munn v. United States*, D.C.App., 283 A.2d 28, 30 (1971); *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 56–57, 478 F.2d 938, 966–67, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

bery and sodomy case, and in that case there was supposed to be four or five subjects, I believe.

The officer could not remember the verbatim description of the subjects, but testified that "[t]hey were all supposed to be [N]egro males in their twenties." Based on the WALES response that the car was wanted in the armed robbery and sodomy case, and based upon his recollection of the general description of "four or five" subjects, Officer McMullen concluded that "as a police officer [he] had reason to suspect that these [men] could possibly have been the suspects."

Officer Conway testified that he "had heard the descriptions [of the armed robbery/sodomy suspects] when they were read off the teletype"; he assumed this occurred "the day after the armed robbery took place", or, in other words, "a day or two" before stopping the car in the instant case. The most he could recall knowing about the suspects' description at the time he stopped the car was that he "had seen a picture of [the car's owner]," and that he remembered "very general descriptions." He was certain the description was of Negro males, but could not remember their ages, their approximate ages, or their builds. The only other detail he could re-

member knowing was that there were "four or five" suspects involved in the armed robbery.

Thus, the sum total of information upon which the officers acted was threefold: (1) this car was wanted in connection with a relatively recent armed robbery and sodomy case; (2) four or five suspects were wanted in connection with that case; and (3) those suspects were Negro males in their twenties. Based on that information, the officers called for a transport wagon and returned the few feet to the car to tell the occupants that they would have to come down to the police station. It was at this point that the limited investigatory stop based on the traffic violation and the nonmatching license and registration turned into an arrest situation as a result of the added information received from WALES[5] and the two officers' recollections of the suspects in the prior criminal offenses.

The most important information to the officers was the fact that the prior case involved an armed robbery. After receiving that response from WALES the officers chose to tell the car's occupants (when they were ordered to exit the car) that the car was stolen, a fact neither the officers nor the car's occupants believed to be true.[6]

---

5. In ruling on the motion to suppress, the trial judge did not decide whether the officers had probable cause to arrest the car's occupants prior to ordering them out of the car. The trial court found that, upon receiving the WALES report, the officers had "sufficient basis for further investigation of the defendant, certainly to have the occupants removed from the car." ·

The WALES and similar systems for the prompt checking of records by radio play an important role in effective law enforcement. Much of the system's usefulness would be lost if the police were not able to make some reasonable checks or inquiry when the information WALES supplies is something less than conclusive.

We find, in light of Officer Conway's testimony that once the WALES report was received the car's occupants were no longer free to leave the scene, that the arrest occurred prior to the order to vacate the car. It is

this arrest for which we must find the requisite probable cause.

6. Officer Conway testified:
It was an armed robbery, and I didn't want to confront armed suspects with something that they might possibly have done and cause an altercation.

. . . . .

They [the occupants of the car] knew that the car wasn't stolen. So, they knew that if I investigated it as being stolen, they would be released.
And if I was investigating it for an armed robbery and they were in fact involved in it or had in fact been involved in it, then they might have resisted arrest.
Officer McMullen concurred:
[W]e actually knew that the car wasn't stolen, and we thought if they [the car's occupants] decided to go along with some-

As each occupant left the car, he was "frisked" before being walked the few feet back to the transport wagon where he was "frisked" again. After appellant had exited the car, Officer Conway observed a gun wedged in between the back and the seat portions of the front bucket seat appellant had just vacated. The officer reached inside the car and extracted the gun. Appellant subsequently was charged and convicted in connection with the possession of that gun.

I

Appellant's first contention on appeal is that once the driver of the car, in which appellant was a passenger, produced a valid driver's license and a valid car registration (but showing the car belonged to someone other than the driver), our decision in *Palmore v. United States,* D.C. App., 290 A.2d 573 (1972), *aff'd on other grounds,* 411 U.S. 389, 93 S.Ct. 1670, 36 L. Ed.2d 342 (1973), required the police officers to let the car and its occupants continue on their way without any further detention. Appellant does not challenge the initial stop (appellant's brief at 16), but relies on the following language in *Palmore, supra* at 583, to support his contention that continued detention is impermissible:

> We say again that when the driver has produced his permit and registration and they are in order he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

We reject this contention as applied to the facts here.

■ The legality of a brief detention after a valid initial stop must be analyzed under the general principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The test to be applied in determining the reasonableness of the detention is whether the facts available to the officer at the moment the detention began, when considered in light of the governmental interest which allegedly supports an official intrusion, warrant a person of reasonable caution to believe that the detention was reasonable. Moreover that detention must be properly limited. *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1971); *Terry v. Ohio, supra* 392 U.S. at 21–22, 88 S.Ct. 1868; *Coleman v. United States,* D.C.App., 337 A.2d 767, 769–70 (1975), *quoting* the pre-*Terry* case of *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966); *United States v. Harflinger,* 436 F.2d 928, 932 (8th Cir. 1970), *cert. denied,* 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971), *citing Carpenter v. Sigler,* 419 F.2d 169, 171–72 (8th Cir. 1969); *United States v. Harris,* 404 F.Supp. 1116, 1123 (E.D.Pa.1975).

In *Palmore* we were concerned about balancing the community's interest in regulating driving by means of licensing and registration laws against the momentary interruption ("spot check") of the motorist to ascertain his compliance with those laws. We held that if a motorist produces his valid driver's license and his car's valid registration, the interests were balanced and the motorist then "must be allowed to proceed on his way". 290 A.2d at 583. The continued detention in *Palmore* was sustained because the driver in that case was unable to produce a valid registration for the car.

■ In the instant case, two facts are present that were not present in *Palmore.* First, the car was validly stopped for a traffic violation and not for a license/registration "spot check". Second, while the license and registration technically were "in order", that is, the license belonged to this driver and the registration was for this car, the two papers were not in the name of the same person

thing they knew was obviously incorrect, then there was very little possibility of any injury being caused to any of us there,

because they would go along knowing that we had nothing on them.

—the driver of the car.[7] Under these circumstances, a brief detention in order for the officers to radio the WALES computer to determine whether the car is stolen is reasonable, properly limited, and thus permissible under *Terry*. *Williams v. United States*, D.C.App., 304 A.2d 287, 289 & n. 5 (1973); *United States v. Harris*, 528 F.2d 1327, 1329 (8th Cir. 1975); *United States v. Jenkins*, 528 F.2d 713 (10th Cir. 1975); *United States v. Hunter*, 471 F.2d 6, 7 (9th Cir. 1972); *United States v. Lepinski*, 460 F.2d 234 (10th Cir. 1972); *United States v. Madril*, 445 F.2d 827, 828 (9th Cir. 1971), *vacated on other grounds*, 404 U.S. 1010, 92 S.Ct. 692, 30 L.Ed.2d 657 (1972).

## II

The second issue we face is whether, on the basis of the WALES report and the officers' own knowledge, there was probable cause to arrest the car's occupants and order them out of the car. We find that there was the requisite probable cause.

■ As has so often been said, probable cause is a flexible concept—its existence depends on and is concerned with reasonable probabilities as seen

> from the viewpoint of a prudent and cautious police officer on the scene at the time of arrest. The question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested. [*Patterson v. United States*, D.C.App., 301 A.2d 67, 69 (1973), *quoting Jackson v. United States*, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962).]

*Munn v. United States*, D.C.App., 283 A.2d 28, 30 (1971); *Harrison v. United States*,

D.C.App., 267 A.2d 368, 370 (1970); *Cox v. United States*, D.C.App., 256 A.2d 917, 918 (1969). In this context, as we have noted before,

> precedent is obviously helpful, but courts should not enmesh themselves in a dissection of the facts of other cases in an effort to bring each case under consideration definitively within or without what is then deemed controlling precedent. Particularly in this area of adjudication, two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second. [*Arrington v. United States*, D.C.App., 311 A.2d 838, 839–40 (1973).]

■ It cannot be repeated too often that in determining the lawfulness of an arrest, the court must give deference to the officers' decision if it was reasonable under the facts as viewed by them even if in retrospect the court might deem another course of action, also reasonable, to have been preferable. *Arrington v. United States, supra* at 839; *Bailey v. United States*, D.C.App., 279 A.2d 508, 510 (1971). *See also Johnson v. United States*, D.C. App., 350 A.2d 738, 740 (1976); *United States v. Ordway*, D.C.App., 329 A.2d 776, 778 (1974). Moreover, room must be allowed for the mistakes of reasonable officers when acting on facts which lead to conclusions of probability. *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Cox v. United States, supra* at 918–19.

■ We turn again to the facts of the instant case, viewing them as they were known to the arresting officers. Both officers knew that the very car they had stopped was wanted by the police department in connection with an armed robbery and sodomy which occurred six days earlier. Both officers recalled that there

---

7. Officer McMullen testified that the car's registration and tags were "valid" but

   [f]or the record, if the name and the registration are different, they can always

—the registration can always be obtained illegally also, so for that reason we make a habit to check both when one is not the same as the other.

were four or five Negro males wanted in connection with that crime; there were four Negro males in the car the officers had stopped. One officer recalled that the wanted suspects were in their twenties; appellant was twenty years old at the time of the arrest. Moreover, Officer Mc-Mullen stated that, based on his experience as a police officer, he concluded that the men in the car could have been the armed robbery and sodomy suspects. The officers' subsequent actions in ordering the men out of the car because of a "stolen car" report is consistent with their conclusion that the men could be wanted, *armed* suspects.

While it may have been preferable for the officers to inquire further about the identification of the wanted suspects, we are not prepared to say that the officers' actions were so unreasonable, when viewed from the standpoint of a prudent and cautious officer, that they warrant reversal. The minimum probable cause requirements were met and the arrest was valid.

The final issue we must discuss is the finding of the gun in plain view once appellant had vacated the car seat.[8] A seizure from an automobile of an object in plain view by an officer who was lawfully in a position to observe the object is a recognized exception to the Fourth Amendment's search warrant requirement. *Hughes v. United States,* D.C.App., 363 A. 2d 284, 286 (1976); *Christmas v. United States,* D.C.App., 314 A.2d 473, 476 (1974), citing *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), and *United States v. Wheeler,* 148 U.S. App.D.C. 204, 459 F.2d 1228, 1229 (1972); *Davis v. United States,* D.C.App., 284 A.2d 459, 460 (1971); *Wise v. United States,* D.C.App., 277 A.2d 476, 477 (1971). Having found that Officer Conway was lawfully arresting the car's occupants when he saw the gun in plain view on the empty seat, we hold that he was justified in seizing the gun. Its suppression was properly denied.

Accordingly the convictions are

*Affirmed.*

---

8. The trial judge found that the gun was in "bona fide plain view."