**Robert A. CAREY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 8816.**

District of Columbia Court of Appeals.

Argued March 9, 1976.

Decided Aug. 1, 1977.

Linda Kay Davis, Public Defender Service, Washington, D. C., for appellant; Frederick H. Weisberg, Public Defender Service, Washington, D. C., also entered an appearance.

Timothy J. Reardon, III, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and James F. McMullin, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEBEKER, YEAGLEY and MACK, Associate Judges.

NEBEKER, Associate Judge:

Appellant was convicted after a jury trial of one count of carrying a pistol without a license, in violation of D.C.Code 1973, § 22–3204. On appeal, he argues that the trial court erred in (1) refusing to instruct the jury on the defense of innocent possession, and (2) denying the motion to suppress the gun seized from him by the police. We affirm the judgment of conviction.

## I.

At about 3:10 p. m. on the day in question, two men entered a laundry establishment and robbed two women. A third man remained outside. When they fled, a report of the offense was made and an initial police radio broadcast, a "tentative lookout flash", ensued. Police in vehicles came to the scene. Among them was an Officer Galante, but he was not the first on the scene because he testified that he saw two "old clothes tac" officers leaving when he arrived at 3:20 p. m. Officer Galante was the only officer who responded to the scene to testify at the suppression motion hearing.

Officer Galante got a description of the suspects from one of the women, but neither he nor his partner broadcast it. It took about fifteen or twenty minutes—that is, until 3:35 or 3:40 p. m.—for him to get that description as the women were "pretty hysterical." It is this description which forms the fulcrum for appellant's challenge to the lawfulness of his arrest. He contended at the hearing on the motion, and does so on appeal, that it established that an earlier broadcast description was sufficiently inaccurate to invalidate his arrest. He also contends that he and his two companions did not sufficiently match the description received to permit their arrest.

The description given Officer Galante was:

> Subject number one was a Negro male, thin, medium complexion, wearing a green nylon ski jacket; subject number two was a Negro male, six foot, medium complexion, wearing dark brown three-quarter length coat. No further description.

The woman was unable to describe a third suspect.

Meanwhile, two other officers were cruising in an area a few blocks from the scene.

At 3:23 p. m. they received a broadcast description respecting this robbery. According to a transcription of this broadcast, the description was for

> number one Negro male armed with a hand gun and in a green jacket . . . Number two Negro male 18 to 19 5 foot 8 light brown complexion dark troussers [sic] plaid shirt, number three Negro male brown complected ¾ beige coat mustach [sic] last seen from Sheriff towards Eastern 1523 . . . . [3:23 p. m.]

The officers began looking for such a group and within fifteen minutes they observed appellant and his companions walking away from the reported scene. They were about seven blocks in distance from that address. They were the only group of three seen as described and they fit the description broadcast.

Appellant was wearing a green army field jacket which was closed. One of his companions also wore a green army field jacket which was open, revealing a multicolored shirt; the third wore a corduroy "medium to dark" brown or tan three-quarter length coat. All three men wore dark pants and had mustaches. One officer testified that they appeared to be "20 to 21, possibly 22" years old. When asked if they did not appear to be "much older than [18 to 19]," he responded, "Not too much, to me . . . ." The other officer was not questioned about the apparent ages of the three, contrary to Appellant's Brief, at 4 & 31. Rather, the thrust of the questions put to him was as to their actual ages. As to age, the topic was ended with, "Isn't it in fact true they were substantially older than that [19 or 20]?" That officer responded, "I'd say they would be about 24." As appellant notes in his brief (at 4, n. 7), he was then 24 years old.

The officers approached the three men, identified themselves, and told them of the reported robbery. Appellant had his hands in his pockets and he was told to remove them. As appellant was being frisked, his right arm stiffened and it had to be forced aside in order for the officer to continue the frisk. The officer felt what he thought to be a gun in the right front pocket of appellant's coat. A search into the pocket revealed a loaded .22-caliber derringer. Appellant explained that he had just found the gun in his recently burglarized apartment and that he was going to the police station to turn it in and report the burglary. The three were then transported to the scene of the robbery where the victims reported that they were not the ones who committed the robbery. Appellant was then charged with carrying a pistol without a license (D.C. Code 1973, § 22–3204).

Appellant argued in a motion to suppress evidence that the search was incident either to an arrest made without probable cause, or to a stop and frisk when the police officers had no reasonable grounds for believing appellant was engaged in criminal activity. The motion was denied by an order, in which the trial court found that the three men substantially matched the description of the robbery suspects given on the police radio run, and that a limited search for weapons was justified based on the report that one of the suspects was armed. After a jury trial, appellant was found guilty of illegally carrying the pistol and was subsequently sentenced to two-to-ten years' imprisonment. The sentence was suspended and appellant was placed on probation for five years. This appeal followed.

## II.

Appellant's request for an instruction on "innocent possession" [1] was based upon his

1. The instruction proposed by defense counsel reads as follows:

Evidence has been introduced which tends to show that the defendant acquired possession of the pistol after it was left in his apartment by a burglar who was surprised when the defendant returned to his apartment and that he carried it for the sole pur-

pose of reporting the offense to the police and turning the weapon over to the police.

You are instructed that if a person has possession of a pistol under certain circumstances which indicate that he did not have the intent to do the acts which constitute the offense of carrying a pistol without a license, that person would not be guilty of carrying a

trial testimony, substantially corroborated by his two companions and his wife, as to events beginning late on the evening of November 26, 1973. At that time, appellant, with the help of his two friends, began the task of moving his family and their possessions from his apartment to his father's home. Leaving appellant's wife and children at his father's home, the three men returned to the apartment building at about 1:30 a. m. Approaching the building, appellant heard a noise "like a door slamming" and noticed that the lights in his first-floor apartment were on and the door was ajar. He had turned off the lights and locked the door when leaving the apartment. Appellant could not immediately ascertain whether any possessions were missing, since the apartment was in disarray and he was not certain about what had already been moved. He did notice that the television and the stereo component set were not in the apartment. He called his wife (from an outside public pay phone) and ascertained that she had the TV but not the stereo set. Searching among the boxes for the component set, he came upon a brown paper bag on top of one of the boxes. Inside the bag was a loaded pistol which he showed to his friends. His friends left the apartment for the night but appellant slept there. It was then approximately 2 a. m., November 27th.

Upon returning to appellant's apartment some time before noon on the 27th, appellant's friends found that appellant still had the gun and had not yet reported the burglary or the gun to the police. Appellant testified that he was considering keeping the gun. After a discussion in which his friends reminded him of his probationary status and that it was illegal for him to have a gun, appellant decided to give the gun to the police. He and his companions testified that they left the apartment at about 3 p. m. and were enroute to the

precinct to turn in the gun and report the burglary when they were stopped by the police.

The trial court ruled that the defense of innocent possession was not available as a matter of law upon the facts of this case. This ruling stemmed from the court's conclusion that even if the jury completely credited the testimony of appellant and his witnesses, all of whom claimed appellant was carrying the gun on the street for the sole purpose of turning it in at the nearest police station, the defense was not available to appellant because he had admittedly found the gun in his apartment and not on the street, and because he thereafter intentionally carried the gun on the street. The trial court said that there might be instances where a special instruction should be given, but ruled this was not such a case.

■ We note at the outset that D.C.Code 1973, § 22–3204, is a statute of general intent, and that proof of intent to use a weapon for an unlawful purpose is not an element of the crime. *Mitchell v. United States,* D.C.App., 302 A.2d 216, 217 (1973). We note further that exceptions to this construction are limited. One exception which has been recognized is possession for self-defense. *Id. See also Wilson v. United States,* 91 U.S.App.D.C. 135, 136, 198 F.2d 299, 300 (1952).

Appellant would assert another defense, that of innocent possession. The possibility of such a defense was acknowledged by this court in *Mitchell v. United States, supra* at 218, and discussed at some length in *Hines v. United States,* D.C.App., 326 A.2d 247 (1974).[2] *Hines* held that the defendant was not entitled to a jury instruction as to the defense of innocent or momentary possession where his admitted purpose in carrying an allegedly newfound pistol was to show it to his girlfriend. The court implied that it might have reached a different result had

---

pistol. In other words, if you do not find beyond a reasonable doubt that the defendant did not have this pistol as the result of its being left in his apartment by a person who had burglarized his apartment and that he merely had the pistol on his person for the

purpose of taking it to the police station to report the burglary then you must find him not guilty.

2. *See also Blango v. United States,* D.C.App., 335 A.2d 230, 235 (1975).

appellant's asserted purpose been civic minded and with an intent to aid law enforcement, e. g., where a "pistol was picked up out of an altruistic motive either to protect the finder or others from harm, to turn it over to the police, or to otherwise secure it." *Id.* at 248. The court cited with approval *People v. LaPella,* 272 N.Y. 81, 4 N.E.2d 943 (1936), in which the defendant's evidence showed that he had found the weapon in a public toilet, put it in his pocket, kept an appointment, and then, twenty minutes after discovering the gun, surrendered it to the police.

■ In this vein, appellant asserts that since his proof demonstrates that his sole purpose in possessing the weapon was to further the aims of law enforcement by turning it over to the police, he was entitled to the proffered instruction. We do not agree. Appellant did not find the gun in a public place, as did the defendant in *LaPella,* nor did he, upon finding it in his apartment, either call the police or take it "as soon and as directly as possible to law enforcement officers." *Hines v. United States, supra* at 249. With full knowledge that possession of the pistol was illegal, appellant nonetheless retained it for more than twelve hours, and then carried it, still loaded, on the street. Under these circumstances, we do not deem his claim properly cognizable as an excuse under the policy of § 22–3204. We therefore hold that under the facts tendered in appellant's defense, he was not entitled as a matter of law to the requested instruction on innocent possession.

### III.

Appellant's two-fold argument to the trial court to suppress the pistol was (a) that the police broadcast was an inaccurate description of the robbers, making police action pursuant to such description unconstitutional, and (b) there was such a variance between the broadcast description and the appearance of appellant and his companions that there was neither probable cause to arrest them nor justification for a stop and frisk. In its written order denying the mo-

tion, the trial court found that the description of the robbers as broadcast on the police radio was substantially the same as the appearance of appellant and his companions. In addition, the order stated that since the radio run described one of the suspects as being armed, the police officers were justified in conducting a limited search for weapons pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The order made no express reference to the accuracy of the radio run. However, a permissible inference of a finding of sufficient accuracy is fairly embraced in the holding made, reasonable and circumstantial accuracy being necessary to lawful police action on the broadcast. *Daniels v. United States,* 129 U.S.App.D.C. 250, 393 F.2d 359 (1968).

We do not reach that aspect of the order of the trial court which held that a *Terry* frisk was justified because we conclude that the particular circumstance of this case gave the officers probable cause to arrest and search appellant. *See Galloway v. United States,* D.C.App., 326 A.2d 803, 804 (1974). Accordingly, the seizure of the pistol from appellant was proper and appellant's motion to suppress the evidence was properly denied.

This court has only recently reiterated that in the area of constitutional inquiry we deal with flexibility as an unavoidable, if not a desirable, ingredient of reasonableness and probability determinations; and we do not hold reasonable action impermissible simply because, in retrospect, an alternative is preferred. *Crawford v. United States,* D.C.App., 369 A.2d 595 (1977). We analyze appellant's contentions in light of these principles.

We note at the outset, in response to the dissent, that although the government did not prove which of the other officers was responsible for initiating the radio broadcast or who, as between the two victims, furnished the information contained in it, no point was made of this lack of proof at the suppression hearing. It is clear that all assumed that one of the victims furnished the details which were broadcast. Like-

wise, the point is not pressed here. While appellant contended at the suppression hearing that the radio run description was inaccurate or garbled, he never suggested that the descriptive information in it originated other than with one of the victims. He was given the opportunity to do so when the trial court suggested the following hypothetical at the hearing:

> [T]he holdup occurred and the police officers give a description from the old ladies that are in the shop, and that then for some reason they got another piece of paper there from another holdup and they send the wrong one out over the air, and they pick your individuals up on that, and as a result of that you're saying it's a clear mistake, that they put the wrong call out, you're saying in such an instance it would be a violation of their constitutional rights. That's the clearest case; where there's a clear mistake and they put out a call that's erroneous.

To this, appellant's counsel answered, "Your Honor, I think that's somewhat distinct from the situation we have in this case." Moreover, at an earlier point in the proceedings, appellant's counsel conceded the possibility that other "tac' officers" obtained from the victims the information which was ultimately broadcast and which served as the basis for appellant's arrest. That inference is fairly embraced in the ruling on the motion.

■ The court in *Daniels v. United States, supra,* 129 U.S.App.D.C. at 252, 393 F.2d at 361, was also faced with the problem that "the Government proved neither which officer was responsible for initiating the lookout nor who gave him the information contained in it. But again no point was made of this lack of proof in the District Court". However, the court held that the absence of direct proof of the source of lookout information is not a ground for suppression and that such source may be proved inferentially. We are satisfied that the radio lookout description was shown to have originated with one of the victims. Thus, it is apparent that the officers in this case were acting on eyewitness information within a few moments of the offense. *See*

*Mitchell v. United States,* D.C.App., 368 A.2d 514 (1977) (majority and concurring opinions); *Lawson v. United States,* D.C. App., 360 A.2d 38 (1976).

■ As a general rule, if the information in a radio run is obtained from a victim of a crime, the bulletin will provide probable cause for an arrest, and the police are entitled to act on the strength of the bulletin. *Whiteley v. Warden of Wyoming State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Galloway v. United States, supra* at 805. That the information comes from a victim with whom the arresting officers have had no direct dealings prior to the arrest does not undermine the constitutionality of an arrest or seizure on the basis of such information. *Brown v. United States,* 125 U.S.App.D.C. 43, 46, 365 F.2d 976, 979 (1966). A victim's report which is demonstrably based on personal observation is a factor stressed in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and in *Lawson v. United States, supra* at 40, as weighing heavily in the constitutional equation.

■ Appellant does not contest these general principles. Rather, he argues that the radio run pursuant to which he was arrested inaccurately reflected the information to the police, and that this inaccuracy negated probable cause to arrest. Appellant bases his claim of inaccuracy of the radio run on the fact that the broadcast description differed from the description given by a victim after the broadcast occurred. It is thus reasoned, falsely, that the earlier description forming the basis of the broadcast must also have been different from the broadcast, thereby making it inaccurate, and giving rise to constitutional deficiencies. Appellant's argument hinges on the unsupportable premise that the description forming the basis of the broadcast was essentially the same as the second description given the police. This does not necessarily follow for it may have been that the two descriptions were given by the same victim on separate occasions or that each victim gave a description at a different

time. Then, too, each of the victims was understandably in an agitated state throughout the immediate post-offense events and their powers of totally accurate recall or repetition of details may not have been optimal. Such factors adequately support the probabilities that the description forming the basis of the broadcast differed in minor fashion from the second description, or may well have been equally accurate.

We look at whether the broadcast description conflicts with the second description, not whether it differs from the second one as appellant urges. This difference in approach is critical to a determination whether the earlier description forming the basis of the broadcast in all probability was accurately reflected in the broadcast. The descriptions differ from each other only as to whether the three-quarter length coat was beige or dark brown. (As to the number of perpetrators, one victim suggested the probability of three individuals even in the nonbroadcast description.) However, the descriptions agree as to the facts that two Negro males and probably a third person committed the offense; that one of them wore a three-quarter length brown coat; and that another wore a green jacket.

Every other difference between the two descriptions is explained by the fact that each description, without being inconsistent with the other, contains some details which the other does not, the radio run being far more detailed than the second description. Such greater detail suggests merely that the radio run was not based on the second description and not that the radio run was an inaccurate transmission of an earlier description. In fact, the greater detail of the radio run serves to disprove defense counsel's argument at the suppression hearing:

> [S]econdly, there was in fact either a garbled communication between the witnesses and the initial officers who took it; they were too hurried in taking it, or they were just plain sloppy in taking it and they got descriptions that were in fact inaccurate. . . .

If anything, the greater detail of the radio run would suggest that it was based on a much more complete description.

Necessarily underlying the conclusion of the trial court that the intrusion was justified is the fact that the broadcast related to this offense and no other, and that the description in the broadcast sufficiently reflected the descriptive details furnished by the victims so as to have avoided constitutional deficiency. The greater and, significantly, nondiscrepant detail of the radio run in combination with the number of details on which it agrees with the second description outweighs the significance of the one descriptive fact on which they disagree. Accordingly, there is sufficient support for the conclusion of the trial court, and we reject appellant's contention that the radio run description was shown to be so inaccurate as to make police action pursuant thereto illegal.

■ As to appellant's second reason why the pistol should have been suppressed, we cannot agree that the trial judge erred in ruling that the physical appearance of appellant and his companions was sufficiently close to the broadcast description as to have given the police probable cause to arrest them. We look first to all of the circumstances to determine whether appellant and his companions reasonably matched the description received. *See Brown v. United States, supra,* in which the court considered the coalescence of numerous significant factors, some in common with the instant case, to make a like decision. Appellant and his companions were apprehended within 25 minutes of the robbery and about 15 minutes after receipt of the broadcast. They were walking in a direction away from and within seven blocks of the crime scene, a distance consistent with the elapsed time. Moreover, the arresting officers noted that appellant and his companions were the only group of three persons they saw in the vicinity during their 15 minutes of cruising.

Appellant makes much of the fact that his group was not acting in a suspicious manner. While suspicious actions will contribute to probable cause, their absence, under the circumstances, is at most neutral

and certainly does not detract therefrom. Additionally, the absence of attempted flight or apprehension as the officers approached can be explained by the fact that the officers were "old clothes" policemen and thus were not recognized as officers.

As to whether the specific physical characteristics of appellant and his companions reasonably matched the broadcast description, we note that the arresting officers observed three Negro males within the age group described (the radio run described only one of the individuals as 18–19 years old and did not state the age of the other two), a green jacket, a three-quarter length tan/beige coat, and a multi-colored shirt, dark trousers on all three suspects, and mustaches. All of these characteristics were enumerated in the radio run.

■ We find from the above factors enough particularized information for the trial judge to have found probable cause to justify an arrest. We note that a crime victim's observation may be faulty in some respects but the mistakes are irrelevant if there is sufficient particularized information and circumstances to constitute probable cause as to identity. *Brown v. United States, supra; Bailey v. United States,* 128 U.S.App.D.C. 354, 389 F.2d 305 (1967). "[R]oom must be allowed for the mistakes of reasonable officers when acting on facts which lead to conclusions of probability." *Crawford v. United States, supra* at 600. The same may be said of mistakes emanating from holdup victims. In *Brown v. United States, supra,* the initial radio run described the perpetrator as a Negro male, heavy build, driving a maroon 1954 Ford. This description was found adequate by the court in light of the fact that the car model was relatively unusual and that the arrest occurred at 4 a. m., when few cars were on the street. A more detailed second broadcast described the perpetrator as 5'5", wearing a brown jacket and cream-colored straw hat. When arrested, the suspect had a felt hat in his car, was wearing blue, and was 5'11" tall. According to the court, such discrepancies "did not destroy the ascertainment made on the basis of the accurate portion of the identification, which was by itself enough to constitute probable cause . . . ." *Brown v. United States, supra,* 125 U.S.App.D.C. at 45, 365 F.2d at 978.

We do not find in *Gatlin v. United States,* 117 U.S.App.D.C. 123, 326 F.2d 666 (1963), the similarity with this case which appellant urges. There was in *Gatlin* a single person observed after a three-person lookout with but one clothing detail, a trench coat. The time between offense and arrest was one hour and forty minutes, and the distance from offense to arrest locale was a mile and one-half.

Moreover, had the police in this case waited for even more detailed information before making the arrests, the suspects' identity might never have been ascertained. The exigencies of the situation made the course of action imperative. "The emergency character of these arrests weighs heavily in determining their reasonableness." *Bailey v. United States, supra,* 128 U.S.App.D.C. at 358, 389 F.2d at 309.

■ Finally, we note that the fact that the victims did not ultimately identify the apprehended individuals as the perpetrators is irrelevant to the question of a valid arrest. The warrantless arrest must be judged as of the time it was made. *Terrell v. United States,* D.C.App., 294 A.2d 860 (1972); *Von Sleichter v. United States,* 153 U.S.App.D.C. 169, 472 F.2d 1244, *cert. denied,* 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972).

The judgment of conviction is

*Affirmed.*

MACK, Associate Judge, dissenting in part:

I concur in Part II of the majority opinion. However, I cannot agree with my colleagues' treatment of the Fourth Amendment issue, and accordingly, I dissent. Before turning to a discussion of that issue, I shall review the pertinent facts.

I.

Two men robbed Ms. Betty Jackson and another woman inside a laundry in North-

east Washington on the afternoon of November 27, 1973. Officer Michael A. Galante responded to a radio run calling all police vehicles to the scene. He heard Ms. Jackson describe the robbers as two Negro males, one of whom was thin, with a medium complexion, and wearing a green nylon ski jacket; the second was six feet tall, with a medium complexion and wearing a dark brown three-quarter length coat. Ms. Jackson thought a third person might have been outside, but she was unsure, and was unable to describe the person, even as to sex or race. Officer Galante did not personally broadcast a radio report based on this description. To his knowledge, his partner did not transmit the description nor did he know if any officer on the scene did so.

Meanwhile, police officers Mendez and Leadman, patrolling in plainclothes in their unmarked car, monitored a citywide police radio lookout for a "robbery-holdup-gun" at the laundry. Officer Mendez testified that the radio run described three Negro males of approximately eighteen to nineteen years of age, one armed with a handgun and wearing a green jacket, another wearing dark pants and plaid shirt, and the third a beige three-quarter length coat and a moustache.

Approximately fifteen minutes after hearing the radio run, Officers Leadman and Mendez spotted appellant and two companions walking west on Sheriff Road, approximately seven blocks from the site of the alleged robbery. Appellant was wearing a green army field jacket that was closed; one of his companions also wore a green army field jacket, open; the third was in a corduroy brown or tan three-quarter length coat. They appeared to be 20 to 24 years of age.

The officers continued past the three men, made a U-turn, and approached from the rear. They identified themselves and told the three men of the reported robbery. Officer Mendez asked appellant to take his hands from his pockets. While frisking appellant, he noticed the right arm stiffen, and he had to force the arm from appel-

lant's side in order to continue the frisk. After feeling what he thought was a gun in appellant's right front coat pocket, he reached into the pocket and retrieved a small .22 caliber derringer with a white handle. Appellant said he had just found it in his apartment and was enroute to the police station to turn in the pistol and report a burglary. The gun was loaded.

The three men were then taken to the scene of the alleged robbery. The victims told Officer Mendez that the three were not the men who committed the robbery. Appellant was subsequently arraigned on the charge of carrying a pistol without a license.

## II.

At the hearing on appellant's pretrial motion to suppress the pistol, his counsel argued that the radio run which prompted the police officers to stop appellant and his companions did not provide sufficient information for the officers either to arrest and search or stop and frisk appellant. Counsel argued further that assuming *arguendo* that the radio run provided sufficient grounds for an arrest or stop, the police action was nonetheless illegal since the radio run bore no relationship to the actual description Ms. Jackson gave of her assailants. In its written order denying the suppression motion, the trial court found that the description of the robbers broadcast on the police radio was substantially the same as the actual appearance of appellant and his companions and that based on the assertion in the radio run that one of the suspects was armed, the police officers were justified in conducting a limited search for weapons, pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The order made no reference to the effect of the radio run on the legality of the seizure of the gun, although the issue was discussed at length at the hearing. In my opinion, the motion to suppress should have been granted.

## A.

It is not disputed that the police officers stopped appellant and his two companions

solely because of a police radio run which they monitored.[1]  Both police officers conceded in testimony on the suppression motion that the three men were not running, looking back over their shoulders, or engaging in any suspicious conduct, but were merely walking down the street.  The men were stopped because they "fit generally" the broadcast description of alleged robbers and, prior to seeing appellant with his friends, the officers had seen no other group of three persons on the street.

Nowhere in the record does the source of this radio run appear.  It is not even apparent whether the lookout was broadcast from the scene or through the central dispatcher.[2]  What the record *does* contain is a description of the assailants, given by Ms. Jackson to Officer Galante[3] moments after the robbery: two[4] Negro males, one of whom was thin, with a medium complexion, and wearing a green ski jacket, the second of whom was six feet tall, with a medium complexion and wearing a dark brown three-quarter length coat.  No evidence was ever introduced by the government to explain the discrepancies between the victim's description—the only one in the record—and the radio run.  The officer who initiated the radio communication has never been identified, nor has any factual basis for the description ever been suggested.

## B.

Thus, in my opinion, a rather narrow question is at issue: In a prosecution based on evidence seized during a stop and frisk[5] by police officers investigating a crime other than the one with which the defendant is charged, should a motion to suppress be denied where the police action is based *solely* on a radio run containing a general description of three suspects; where the implication that the radio run was based on a report by a victim or eyewitness is negated by (a) record evidence that a victim gave police a substantially different description, and (b) the fact that the victims did not identify the defendant as one of their assailants; and where the source of the radio run is never identified nor any factual basis suggested for the description it contained.

Clearly appellant was "seized" and subjected to a "search" within the meaning of the Fourth Amendment.  *Terry v. Ohio, supra.*  Applying *Terry* standards, the trial court held that the frisk was reasonable in that the radio run suggested that at least one of the suspects was armed and dangerous.  But if a "frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an en-

1.  A transcript of the radio run was marked for identification at the government's request at the motion hearing but was never introduced into evidence.  The transcript is, however, contained in the trial jacket and is also attached as Appendix A to appellant's brief.  The transcript reads as follows:

Disp.: Units lookout for robbery holdup gun 1510 today's date 1516 Sheriff Road, North East number one Negro male armed with a hand gun and in a green jacket  .  .  . Number two Negro male 18 to 19 5 foot 8 light brown complexion dark troussers [sic] plaid shirt, number three Negro male brown complected ¾ beige coat mustach [sic] last seen from Sheriff towards Eastern 1523.
.  .  .  .
This transcript is for the radio run broadcast in Zone Two.  Officer Mendez testified that he and Officer Leadman received radio communications on Zone One.  No transcript of the run broadcast in Zone One was produced.  Officer Mendez implied that the same information is broadcast in all radio zones for serious offenses such as robbery.  Officer Mendez did read the

contents of this radio run transcript and stated at the suppression hearing that it contained essentially the same information that he heard over his radio.

2.  The meaning of "Disp.," found at the start of the transcript, is unclear.  *See* note 1, *supra.*

3.  Officer Galante testified at the suppression hearing from the police report form on which he wrote the description as it was given to him by Ms. Jackson.

4.  As noted previously, Ms. Jackson thought a third person might have been outside, but she was not certain, and could give no description whatsoever.

5.  My analysis proceeds from the assumption that the initial intrusion was a "stop and frisk" rather than an arrest, because the trial court so found.  However, this reasoning applies with even greater force to an arrest, which is what appellant argued—and the majority has decided—occurred in this case.

counter, to make a forcible stop." *Terry, supra* at 32, 88 S.Ct. at 1885 (emphasis omitted) (Harlan, J., concurring).

To satisfy the reasonableness requirement of the Fourth Amendment and justify a stop for questioning, a police officer must be able to point to the "specific and articulable facts" which warranted the intrusion. Here, the only "facts" known to Officers Leadman and Mendez were the very general descriptions contained in the radio run. In such a case it is not enough to determine, as did the trial court, that appellant and his companions substantially fit the radioed descriptions, for there is nothing in this record to support even an inference as to the source and reliability of the radioed description. Regardless of the good faith of Officers Leadman and Mendez, their actions cannot be insulated from constitutional challenge solely because they acted on the basis of a radio run. *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 723 (1971); *Galloway v. United States*, D.C. App., 326 A.2d 803, 805 n.1 (1974).

*Whiteley v. Warden, supra,* involved a challenge to the constitutionality of the use at trial of evidence seized during a search incident to an assertedly illegal arrest. Whiteley and a companion were subjected to a warrantless arrest, and a subsequent search and seizure on the basis of a police radio run from another county, which contained the names and description of two men for whom an arrest warrant had just been issued. The Supreme Court held that the complaint pursuant to which the arrest warrant was issued failed to establish probable cause, and that the arrest and search of Whiteley—even though conducted by officers other than the one who obtained the constitutionally defective warrant—were illegal. One of the arguments pressed by the State in support of the legality of the arrest and search was that since the arresting officers had relied on the police radio run in making the arrest, and not on the unnamed informant, the arrest was legal because they had probable cause to believe that the men in the car were those described in the bulletin. To this argument, the Supreme Court replied:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest. [*Whiteley v. Warden, supra* at 568, 91 S.Ct. at 1037.]

Therefore, it is the radio run itself to which the inquiry must be directed: was *it* based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"? *Terry v. Ohio, supra* at 21, 88 S.Ct. at 1880. When a detention and search are based solely on information relayed by police transmission facilities of which the police officer himself had no personal knowledge, the government must, when challenged, show that the information on which the action was based had a reasonable foundation.[6]

---

**6.** *Accord, United States v. Robinson,* 536 F.2d 1298 (9th Cir. 1976); *United States ex rel. Mungo v. LaVallee,* 522 F.2d 211 (2d Cir. 1975), *vacated and remanded on other grounds,* 428 U.S. 907, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976); *United States v. Impson,* 482 F.2d 197 (5th Cir.), *cert. denied,* 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973), *aff'd after remand,* 506 F.2d 1055 (1975) (per curiam), *vacated and remanded on other grounds,* 422 U.S. 1031, 95 S.Ct. 2647, 45 L.Ed.2d 688, *reversed and remanded on other grounds,* 531 F.2d 274, *reh.*

*denied,* 535 F.2d 286 (1976). *See also United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.) *cert. denied,* 429 U.S. 978, 97 S.Ct. 489, 50 L.Ed.2d 586 (1976).

In *United States v. Robinson, supra,* the Ninth Circuit considered the applicability of *Whiteley v. Warden* to a nonarrest situation and held that founded suspicion, like probable cause, cannot "be based solely on the receipt by the stopping officer of a radio dispatch to stop the described vehicle, without any proof of the factual foundation for the relayed mes-

I am acutely aware that it is necessary to effective law enforcement that police officers, faced with emergent circumstances, must "stop and frisk" and arrest on the basis of information conveyed to them by others. We have never held, however, nor should we, that (no more than in cases involving the obtaining of a warrant) the reliability of the information need not be established. Thus, a finding of probable cause based on information received from an unknown or unidentified informant requires some showing of the factual basis upon which the informant concluded that a crime had been committed, and of the informant's veracity or the reliability of his information. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Mitchell v. United States*, D.C.App., 368 A.2d 514 (1977). Similarly, a police officer may stop and frisk on the basis of a passerby's report that a person is carrying a gun, but only after the officer has confirmed through personal observation various specifics which were given in the description. *See, e. g., Lawson v. United States,* D.C.App., 360 A.2d 38 (1976); *Galloway v. United States,* D.C.App., 326 A.2d 803, 805 (1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Davis v. United States,* D.C.App., 284 A.2d 459 (1971); *United States v. Dowling,* D.C.App., 271 A.2d 406 (1970). The victim of or an eyewitness to a crime is generally considered a reliable informant. *Galloway v. United States, supra* at 805. None of these indicia of reliability exists on the record before us.

My colleagues in the majority do not dispute these general principles. Rather, they claim to be "satisfied that the radio lookout description was shown to have originated with one of the victims." Had such a showing been made, I would not be dissenting. We cannot infer that the information received by the arresting officers came from a victim or eyewitness—*cf. Galloway v. United States, supra*—when the record contains a divergent description given by the victim to another officer. Absent identification of the source of this radio run, we do not know whether "the police officer initiating the chain of communication either had firsthand knowledge or received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth." *Daniels v. United States,* 129 U.S. App.D.C. 250, 252, 393 F.2d 359, 361 (1968). Under such circumstances it is *not* "reasonable to conclude that such report resulted from an eyewitness observation." *Galloway, supra* at 805.

Although the quantum of information required to uphold an arrest may differ from that required to legitimize a stop and frisk, it does not follow that the quality may be likewise dissimilar. The standard enunciated in *Terry* is "specific and articulable *facts.*" This standard is not satisfied by an anonymous police radio run which conflicts with the victim's description and for which the government presents no explanation in response to the defendant's challenge.

As the Supreme Court has said, "This demand for specificity in the information

sage." 536 F.2d at 1299. In *Mungo v. LaVallee, supra,* the court held that where the source of a police radio report on which the officer based his stop of the appellant's vehicle was never identified, probable cause did not exist for his arrest, and items found during the search should have been suppressed. The appellant had been arrested and taken into custody following a police radio communication concerning an episode unrelated to the offenses of which he was convicted on the strength of evidence seized from him and his car after the arrest. The circuit court rejected the district court's assumption that the report was made by a witness at the scene of the crime, where the record yielded no such information. When

the arrest was challenged by appellant's pretrial motion to suppress, the prosecutor had the burden of establishing probable cause. That burden was not met, where the total facts within the arresting officer's knowledge were those reported in the radio bulletins, and the source of that information remained unknown. *Id.* at 214–15. Similarly, the Fifth Circuit in *United States v. Impson, supra,* vacated the conviction and remanded for a further hearing on the appellant's motion to suppress, which had been denied by the trial court without any effort having been made to show the nature or source of the information which had prompted the pickup alert which resulted in Impson's arrest.

**52**

upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry v. Ohio, supra* at 21, n. 18, 88 S.Ct. at 1880. Adhering to this principle, I cannot join the majority in affirming the denial of appellant's motion to suppress.

I respectfully dissent.