**John Thomas PEAY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 88–678.**

District of Columbia Court of Appeals, On Rehearing En Banc.

Argued En Banc Dec. 11, 1990. Decided Oct. 10, 1991.

John M. Copacino, Washington, D.C., with whom Shailly P. Agnihotri, New York City, Georgetown Crim. Justice Clinic, was on the brief, for appellant.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Thomas J. Hibarger and Robert C. Little,

Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB and WAGNER, Associate Judges, and BELSON, Senior Judge.[*]

STEADMAN, Associate Judge:

This case involves an encounter between a lone police officer and the appellant, clutching in his hand something that "could possibly have been a weapon, a small knife, possibly a gun," on the third floor of an apartment building known for narcotics trafficking. We affirm the trial court's ruling that the officer's stop of the appellant for further investigation was reasonable within the meaning of the Fourth Amendment.

## I

Fourteen twenty-nine Girard St., N.W., Washington, D.C., was an apartment building which the police would routinely enter and check for the illegal drug trafficking for which the building was known. On the afternoon in question, Officer Emmett Queen and two fellow officers, in plain clothes, pulled up to the entrance of the building to make such a routine check.[1] Appellant was standing in the doorway of the building; as he looked at the officers exiting their car, he "le[ft] the scene rather hurriedly" and went inside the building.

The team of officers entered the building and fanned out to engage in the drug patrolling.[2] Officer Queen mounted the staircase to the third floor, where he came upon appellant in the hallway some three feet

away. Queen noticed appellant clutching something in his left hand. Queen could not tell exactly what it was but thought it "could possibly have been a weapon, a small knife, possibly a gun." As Queen approached, appellant turned away from Queen. Thereupon, in a roughly simultaneous time frame,[3] Queen identified himself as a police officer, asked appellant to stop, inquired what appellant had in his hand, and, as appellant started walking away without responding, followed and put his hand on appellant's shoulder, at which time, as he pulled away from Queen, appellant dropped some thirteen small plastic bags to the floor. These subsequently were found to contain marijuana.

Following a suppression hearing, the trial court found that on the facts here, Queen had "articulable suspicion of criminal activity and danger to himself" upon which to base the stop. Hence, the trial court denied the motion to suppress. At trial, a jury found appellant guilty of possession with intent to distribute cannabis in violation of D.C.Code § 33–541(a)(1) (1988). On appeal, a panel of this court reversed the denial of the motion to suppress, 575 A.2d 279 (D.C.1990). We granted the government's petition for rehearing and vacated the panel opinion. 580 A.2d 1331 (1990).

## II

■ The basic legal framework here is a familiar one. To justify an investigative detention under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police "must be able to point to specific and

---

[*] Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

[1] Officer Queen, the only witness at the suppression hearing, could not recall whether the vehicle in which they were riding was marked or unmarked.

[2] Each officer went to a different floor.

[3] The testimony was somewhat imprecise in the exact sequence of events, and that given at the suppression hearing was at points not totally consistent with that later given at trial. An issue might be presented whether when Peay dropped the bags, he was "seized" within the definition of that concept recently set forth in *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (no seizure where fleeing subject not yet within physical control), with respect to which we requested supplemental memoranda from the parties. These memoranda raised the further issue of the proper use of such trial testimony. Since the trial court's ruling may be sustained even if Peay had been constitutionally seized by Queen when he dropped the bags, we proceed from that assumption and need not reach the *Hodari D.* or related issues.

articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. This "minimal level of objective justification" is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In determining whether a *Terry* stop is lawful, the court must look to the "totality of the circumstances." *Alabama v. White,* ―― U.S. ――, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981).[4] Even if each specific act by a suspect could be perceived in isolation as an innocent act, "the observing police officer may see a combination of facts that make out an articulable suspicion." *United States v. Bennett,* 514 A.2d 414, 416 (D.C.1986). *See Sokolow, supra,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87 ("Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation'" (citation omitted)); *Illinois v. Gates,* 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983) ("innocent behavior frequently will provide the basis for a showing of probable cause"). In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling. *Nixon v. United States,* 402 A.2d 816, 819 (D.C.1979); *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C.1976) (where no express findings, appellate court is to "determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence").

■ We agree with the trial court that the case before us presented sufficient "specific and articulable facts" to make constitutionally reasonable the police officer's decision to "detain [appellant] briefly in order to 'investigate the circumstances that provoke[d] suspicion.'" *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (citation omitted). We review the circumstances surrounding the *Terry* stop.

### A

The officers arrived for the routine patrol of a specific building known for its narcotics trade. As they arrived, the defendant, upon seeing them, rapidly went *into* the building. Appellant argues that this fact should be discounted, since the defendant may not have been aware that they were police officers and since appellant "merely walked" away, citing *Smith v. United States,* 558 A.2d 312, 316–17 (D.C.1989) (en banc), and *In re D.J.,* 532 A.2d 138, 141 (D.C.1987). However, the instant case is significantly different. Here, the defendant did not depart *from* the area of suspected activity but on the contrary went directly *toward* it, in a manner described at the suppression hearing as "leav[ing] the scene rather hurriedly." Moreover, the movement of appellant occurred previous and not subsequent to the immediate event leading to the stop. The reaction of the appellant thus bears upon the issue as not only a possible reflection of "consciousness of guilt" but also as related to the possible on-going narcotics trafficking within the building itself (such as a warning to such participants of approaching strangers).[5] Moreover, the place to which the appellant hurried and where the subsequent confrontation took place was not some generalized neighborhood or even public street where drug activity was rife but rather a specified identified and isolated private locale, known for such traf-

---

**4.** As the Second Circuit put it, "We view as wise the admonition of the District of Columbia Circuit that 'the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole.'" *United States v. Magda,* 547 F.2d 756, 758 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977) (quoting *United States v.*

*Hall,* 174 U.S.App.D.C. 13, 15, 525 F.2d 857, 859 (1976)).

**5.** *Cf. Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) ("deliberately furtive actions and flight at the approach of *strangers* or law officers are strong indicia of *mens rea*") (emphasis added).

ficking and regularly patrolled by the police.

Thus, when Queen mounted the apartment stairway to the third floor and entered the third story hallway, he came upon appellant not as a total stranger, not as an apartment dweller just leaving his quarters or strolling the halls, but as an individual who had hastily entered the building shortly before. Furthermore, appellant had not, as might be expected were he a resident, entered the apartment in which he lived but instead was standing in the hallway "clutching something in his hand" at a distance of some three feet from Queen, who was by himself. Queen testified that he thought the object appellant was clutching "could possibly have been a weapon, a small knife, possibly a gun." [6]

## B

In the District of Columbia, it is an offense to carry "either openly or concealed on or about [one's] person ... a[n] [unlicensed] pistol ... or any deadly or dangerous weapon capable of being so concealed." [7] D.C.Code § 22–3204 (1990 Supp.). Moreover, as has been often observed, drugs and weapons go together. *See, e.g., United States v. Payne,* 256 U.S.App.D.C. 358, 361, 805 F.2d 1062, 1065 (1986) (collecting cases); *Irick v. United States,* 565 A.2d 26, 31 (D.C.1989) (expert testimony that "when you relate to drugs and guns it's like a marriage"). Therefore, Queen might reasonably suspect not only that a criminal violation was taking place but that his own personal safety was at peril.[8] As the trial court stated, when Queen stopped appellant and asked what he had in his hand, Queen "was only addressing what for him was an articulable suspicion of criminal activity and danger to himself."

It is suggested that such a belief of Queen was not objectively reasonable because no pistol or switchblade knife is capable of concealment by someone who is "clutching something in his left hand." We cannot as an appellate court make such a finding of fact in contradiction of the stated belief of a trained police officer and in the absence of any such showing in the record or finding by the trial court. *See Davis v. United States,* 564 A.2d 31, 35 (D.C.1989) (en banc); *Wilson v. United States,* 444 A.2d 25, 29 (D.C.1982); *Giles v. United States,* 400 A.2d 1051, 1054 (D.C.1979); D.C.Code § 17–305(a) (1989). Moreover, with respect to other objects which might constitute dangerous or deadly weapons if carried with an intent to so use them and which could be readily concealed, considering the surrounding circumstances discussed above, we do not think that Queen's concern that appellant might use whatever was concealed in his hand in that manner can be labeled objectively un-

---

**6.** Appellant stresses the use of the word "possibly." We think it a fair reading of the testimony, especially in light of the repetitive use of the word, that Queen's use of that word did not reflect a wholly speculative attitude but instead could be descriptive of a variety of possible objects.

**7.** The test to be applied in determining whether an item is a "deadly or dangerous weapon" is whether, under the circumstances, the purpose of carrying the item was its use as a weapon. *Nelson v. United States,* 280 A.2d 531, 533 (D.C.1971) (per curiam); *Clarke v. United States,* 256 A.2d 782, 786 (D.C.1969); Criminal Jury Instructions for the District of Columbia, No. 4.81 (3d ed. 1978).

If appellant were in fact armed, he might also, or alternatively, have been in violation of D.C.Code § 22–3214 (1989), which provides in pertinent part:

(a) No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or ... switchblade knife....

(b) No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon.

For present purposes, there is no relevant distinction between the two Code sections as to the nature of the weapons they apply to nor the requisite intent, with the exception of those weapons, here an unlicensed pistol or switchblade knife, whose possession or carrying is banned regardless of intent.

**8.** As the trial court noted in its ruling: "[Queen] and two other police officers were in a building where they knew there was a traffic in drugs, and they also knew of the dangers to their own safety inherent in drug trafficking and being in areas where drugs are being sold."

reasonable as a matter of law. As our sister federal court has cautioned "in judging the reasonableness of the actions of the arresting officer," the circumstances "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Young*, 194 U.S.App.D.C. 377, 379, 598 F.2d 296, 298 (1979).[9]

### C

Appellant makes much of the fact that after the challenge by Queen, appellant began walking away, which should have dissipated any suspicion on Queen's part as to how the object might be used. We fail to see why as a matter of law, Queen must have been expected to continue his patrolling of the hall without regard to appellant's possible possession of a weapon, given all the surrounding circumstances, or why the fact that appellant turned away from Queen necessarily indicates that he had no intent to use a weapon against anyone. *Cf. Michigan v. Long*, 463 U.S. 1032, 1048–52, 103 S.Ct. 3469, 3480–82, 77 L.Ed.2d 1201 (1983) (permissible to search automobile which *Terry* detainee may re-enter after release).

 The personal safety of a police officer in a confrontation is a relevant consideration in the *Terry* equation. *Terry* itself, albeit in the context of a post-stop frisk, dealt at length with this general issue:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officials are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.

392 U.S. at 23–24, 88 S.Ct. at 1881 (footnote omitted). *See Michigan v. Long, supra*, 463 U.S. at 1052, 103 S.Ct. at 3482 ("[W]e stress that a *Terry* investigation ... involves a police investigation 'at close range' ... when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger....' In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter" (citations omitted) (emphasis in original)); *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981) (officer safety a permissible justification for detaining occupant of premises being searched pursuant to valid search warrant); *Pennsylvania v. Mimms*, 434 U.S. 106, 110–12, 98 S.Ct. 330, 333–34, 54 L.Ed.2d 331 (1977) (per curiam); *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *United States v. Mason*, 450 A.2d 464, 466 (D.C.1982) ("protection of the officer making the stop and of innocent bystanders is of paramount importance" and "has been called the rationale of *Terry*"); *Lewis v. United States*, 399 A.2d 559, 562 (D.C.1979); *Gilchrist v. United States*, 300 A.2d 453, 455 (D.C.1973).

We do not say that a concern based on personal safety, standing alone, will necessarily suffice to warrant a *Terry* stop. However, it is a factor that need not be

---

**9.** The Supreme Court has made the same point in the context of a *Terry* stop, cautioning that the evidence of suspicion "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

ignored when considering whether the "totality of circumstances" permits an officer to "detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty, supra,* 468 U.S. at 439, 104 S.Ct. at 3150 (citation omitted).

For all the foregoing reasons, we conclude that such a detention was constitutionally permissible here. Hence, the drugs that appellant let loose from his hand could lawfully be entered into evidence, as the trial court held.

*Affirmed.*

FERREN, Associate Judge,* with whom ROGERS, Chief Judge, and SCHWELB, Associate Judge, join, dissenting:

The majority focuses on three facts: (1) appellant's hurried[1] entry into an apartment building upon seeing three men in plain clothes pull up in front of the building in an unmarked[2] car and get out; (2) the reputation of the apartment building for illegal drug trafficking; and (3) Officer Queen's encounter on the third floor of the building with appellant, who was clutching in his hand something that "could possibly have been a weapon, a small knife, possibly

a gun." In my judgment these factors, even when taken together with all reasonable inferences, do not comprise a critical mass of information giving rise to a reasonable suspicion of impending criminal activity justifying a seizure under *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *See Sibron v. United States,* 392 U.S. 40, 63–65, 88 S.Ct. 1889, 1903–04, 20 L.Ed.2d 917 (1968); *Duhart v. United States,* 589 A.2d 895, 899 (D.C.1991).

As I now see this case, nothing can properly be made of appellant's hurriedly entering the apartment building when the three plainclothes officers pulled up in front and got out of an unmarked car. There is no record basis for believing appellant perceived a police "jump-out" squad, and thus I see no way we can properly attribute even a hint of guilt-consciousness to appellant at that time. *See United States v. Jones,* 619 F.2d 494, 498 (5th Cir.1980). It is just as likely that he feared a "gang of fast-driving toughs" rather than the police. *Smith v. United States,* 558 A.2d 312, 319 (D.C.1989) (en banc) (Ferren, J., concurring).[3] At this point, therefore, the police had no basis for an articulable suspicion of

---

* Speaking only for myself, this is one of those cases where oral argument made a considerable difference. Originally, the case was submitted to a division of this court on summary calendar, without oral argument, and I voted—in dissent—to affirm denial of the motion to suppress. After oral argument en banc, where the full court had an opportunity to probe the ambiguities of the record, I am satisfied the trial court erred; the motion to suppress should have been granted.

1. At the suppression hearing, Officer Queen first testified that he "observed the defendant standing there in front of the door. And, as we exited the vehicle, the defendant then—well, the defendant first looked our way, then went inside of the building." He then testified that "Mr. Pea[y] did leave the scene rather hurriedly." At trial, Queen testified that "the defendant then ran inside of the building."

2. The majority says that Officer Queen could not recall whether the police car was marked or unmarked. *Ante* at 1319, n. 1. At trial, however, Queen acknowledged that the car was probably unmarked. Counsel for the govern-

ment at oral argument on appeal also acknowledged that the car was probably unmarked.

3. It is true that, "simply because certain conduct may be construed as consistent with innocence does not mean that this conduct may not form the basis for reasonable suspicion." *United States v. Gomez,* 776 F.2d 542, 548 (5th Cir. 1985); *see United States v. Black,* 675 F.2d 129, 137 (7th Cir.1982). In this case, however, appellant had no perceptible reason to believe three men dressed in plain clothes, walking in his direction from an unmarked car, were police officers; for all he could tell these men were on a different kind of mission. Accordingly, the three officers had no reason to believe appellant was running from them because of a guilty conscience about breaking the law. If, however, the officers had been in uniform, appellant's flight may have implied guilt consciousness despite alternative, innocent explanations for wanting to avoid police contact. *But cf. In re D.J.,* 532 A.2d 138, 141 (D.C.1987) (assuming appellant knew pursuers were police officers, his attempt to walk away unhurriedly indicated merely "a desire not to talk to the police" from which "[n]o adverse inference may be drawn").

criminal activity—unless appellant's entry into the building itself was suspicious.

It is true appellant entered a specific building, not merely a geographical area of several blocks, known for "high crime" activity. Indeed, this building apparently was so well known for narcotics distribution that the police routinely patrolled it and inspected every floor when doing so. But what are the police to make of someone seen in the corridor, even someone who ran inside upon seeing three men approaching the building? Without more, I believe there can be no basis for a reasonable inference that the person is criminally involved. There are too many other legitimate reasons to be in an apartment building, not the least of which is that the person lives there and is going home. *See In re D.J.*, 532 A.2d 138, 143 (D.C.1987); *Jones v. United States*, 391 A.2d 1188, 1191 (D.C.1978). The majority's suggestion that appellant may have been going inside to warn narcotics traffickers about "approaching strangers," *ante* at 1320, is pure speculation. Even if drug dealing is known to take place in a multi-story apartment building, that fact in itself cannot make someone in the corridor criminally suspect. "Innocent activities do not become sinister by the mere fact that they take place in one of these [high narcotics] areas." *In re D.J.*, 532 A.2d at 143. At this point, therefore, two "zero" factors, taken together with all reasonable inferences, equal zero.

But there is a third factor: when Officer Queen confronted appellant on the third floor he saw him clutching something (without knowing what) in his left hand near his waist. According to Officer Queen's testimony at the suppression hearing, "[i]t could possibly have been a weapon, a small knife, possibly a gun." But only "possibly." The officer did not see something shiny, or pointed, or anything at all for that matter.[4] At trial, Officer Queen admitted without hesitation that he did not know what was in appellant's hand.[5] It may be that, under the circumstances, the officer subjectively feared appellant had a weapon, but he did not say so,[6] and there was no objective basis for believing there was a weapon unless one dignifies the assumption that any adult male in this particular building was likely to be carrying a gun or a knife. I am not willing to do so. There is no record basis tending to indicate that the police, upon seeing a man in the corridor clutching something small and unrecognizable in his hand, should reasonably expect to encounter someone carrying a weapon rather than simply a resident going about his business carrying keys or some other innocuous, small item. In short, the hand-clutching is

4. Officer Queen testified at the suppression hearing that he "found the defendant on the third floor clutching something in his left hand." "[Peay] was clutching something in his hand ... clutching something in his left hand."

Queen did not say he thought Peay may have had a weapon until the following exchange two pages later in the transcript:

Q: When you first observed the defendant on the third floor clutching something in his, you said, left hand, what did you think, if anything, that was?

A: Possibly it—it could possibly have been a weapon, a small knife, possibly a gun.

Q: *You could not tell exactly what it was?*

A: *No, I could not.*

Q: All right. *When did you have a suspicion or idea as to what it was?*

A: When the defendant then turned away from me and began to walk and started dropping the bags to the ground.

(Emphasis added.)

5. At trial, Officer Queen testified:

Q: You testified that you saw something in the defendant's hands?

A: Yes.

Q: *And you didn't know what it was?*

A: *That's correct.*

Q: Did you ask him anything?

A: After I stated, "Police," tell him to stop there, I may have. I do not remember if I stated specifically, "Is there something in your hand?"

(Emphasis added.)

He also testified:

A: [Appellant] was still clutching something in his hand there.... *I had no idea what it was in his hand.*

(Emphasis added.)

6. Officer Queen testified: "In a way, I approached him rather cautiously. I had no idea what it was in his hand. It could have been...." Before he could speculate, defense objected, and Officer Queen did not finish his statement.

a "zero" factor as well.[7] So how does the majority find a basis for the seizure? [8]

As I read Judge STEADMAN's opinion, the majority bootstraps an inadequate basis for seizure into a reasonable suspicion by adding a fourth factor: Officer Queen's concern for his own safety. If the majority agrees—as surely it must—that the officer's testimony does not in itself demonstrate a reasonable basis for believing, rather than speculating, that appellant had a gun or a knife, then my colleagues are willing to credit the officer's *subjective* fear as a *Terry* factor, which is contrary to all the *Terry* case law based on reasonable—meaning objective—suspicion. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1880 (seizure must be justified by "specific and articulable facts ... judged against an objective standard"); *Sibron*, 392 U.S. at 64, 88 S.Ct. at 1903 (police officer must provide particular facts to justify rational inference of crime); *Jones*, 391 A.2d at 1191 (officer cannot rely on hunches or suspicions); *Coleman v. United States*, 337 A.2d 767, 772 (D.C.1975) (same). Contrary to the majority opinion, the "personal safety of a police officer in a confrontation is a relevant consideration in the *Terry* equation," *ante* at 1322, only as applied to legitimating a frisk after a seizure that is otherwise lawful. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (officer may conduct limited protective search when "justified in believing" suspicious individual "is armed and presently dangerous"); *Sibron*, 392 U.S. at 64, 88 S.Ct. at 1903 (to justify self-protective search, officer "must be able to point to particular facts from which he [or she] reasonably inferred that the individual was armed and dangerous"); *Terry*, 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring) (officer must have constitutional grounds

to make forcible stop before frisk is justified to protect officer during encounter with citizen); *see generally* 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a) at 499–501 (2d ed. 1987).

The law—until the majority opinion in this case—has never purported to make an officer's fear an independent basis, among others, justifying a Fourth Amendment intrusion. A *Terry* seizure, rather, must be reasonably premised on the suspect's behavior, not on a police officer's subjective state of mind. *See Duhart*, 589 A.2d at 899 (police officer must point to particular criminal activity); *United States v. Trullo*, 809 F.2d 108, 110–11 (1st Cir.) ("[reasonable] suspicion cannot be inchoate, but must be based on 'specific and articulable facts....'"), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

As I see it, therefore, appellant hurriedly went into an apartment building upon seeing three strangers approaching (with no discernible basis for believing they were police officers). The building he entered was known for narcotics activity, but the officers, upon entering the building, had no reasonable basis for believing appellant was involved in such activity. Officer Queen soon saw appellant on the third floor clutching something the officer could not identify, although he speculated "it could possibly have been a weapon, a small knife, possibly a gun." The officer asked appellant to stop, touching or grasping appellant's shoulder. At that point appellant dropped the "weapon": bags of marijuana. See *ante* at 1321, note 7. As to this scenario, I believe counsel for appellant at oral argument put the matter correctly: if Officer Queen had seen appellant with a knife or gun, that would have given him probable

---

7. I do not understand the majority to attribute any guilt-consciousness or other reason for a *Terry* seizure to appellant's effort to walk away from Officer Queen on the third floor in an obvious move to avoid a "consensual encounter" with him. *See Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 2383, 115 L.Ed.2d 389 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Smith*, 558 A.2d at 319 (Ferren, J., concurring).

8. The majority proceeds on the assumption that Officer Queen had seized appellant before appellant dropped the bags of marijuana as he pulled away from the officer's grasp and tried to walk away. See *ante* at 1319–20 & n. 3. I agree that, although the record on the timing of events is murky, the government has not demonstrated that appellant dropped the bags before seizure. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1879.

cause to arrest; if the officer had seen appellant with something "shiny" or "pointy," that probably would have justified a *Terry* seizure; but if appellant only had something with no describable indicia suggesting what it was—this case—there could have been no seizure without violating the Fourth Amendment.

Appellant was convicted of possession with intent to distribute marijuana, so it may be difficult to sympathize with him. But because this seizure is sustained, I worry that the police will feel justified in stopping innocent citizens simply because of a hunch that the suspect "possibly" is carrying a weapon. I believe the Fourth Amendment forbids such policing. Respectfully, therefore, I dissent.