763 A.2d 1152 (2000)
In re D.A.D., District of Columbia, Appellant.
No. 99-FS-393.
District of Columbia Court of Appeals.
Argued September 14, 2000.
Decided December 21, 2000.
*1153 Rosalyn Calbert Groce, Supervisory Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on brief, for appellant.
Robert E. Schulz, appointed by the court, for appellee.
Before STEADMAN, REID, and WASHINGTON, Associate Judges.
WASHINGTON, Associate Judge:
At a motions hearing, appellee, D.A.D., prayed that the court suppress physical evidence used to charge him with carrying a pistol without a license in violation of D.C.Code § 22-3204 (1996 Repl.), and possession of an unregistered firearm in violation of D.C.Code § 6-2311(a) (1995 Repl.). The trial court granted the motion to suppress physical evidence recovered from his person based on Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The government filed a timely notice of appeal, arguing that the trial court erred in suppressing the physical evidence and concluding that the officers did not have reasonable suspicion to stop and frisk D.A.D. We reverse and remand.

I.
The defendant in this matter, D.A.D., is a juvenile. The trial court heard the testimony of two officers of the District of Columbia Metropolitan Police Department and credited their testimony. The trial court found that on September 25, 1998, Officer Davis and Sergeant Perrin were investigating a report of repeated gunfire near South Capitol Street. At approximately 11:00 p.m., the officers heard gunshots and received information from the station as to where the shots were fired. *1154 The radio contact operator stated that the gunfire occurred in the rear of the 4511 South Capitol Street, S.W. apartment complex near a trash can.[1]
When the officers arrived on the scene, they saw a black man near the dumpster wearing a dark cap and a light shirt. Officer Davis testified that when he spotted the man he was approximately thirty-five to forty yards from where the man was standing. He asked the man to stop, but the man began to run away. Officer Davis ran down a flight of stairs and into the area where the suspect had originally been spotted. By the time Officer Davis got there, the suspect had disappeared. Officer Davis testified that the man was ten to fifteen feet from the aforementioned dumpster and about two feet from where the shell casings were subsequently found.
As the officers were assessing the area to determine where the individual may have run, another individual began walking through the alleyway between the apartment complexes located at 4511 and 4513 South Capitol Street, S.W. The officers immediately drew their guns and ordered the second man to put his hands up against the wall. In his testimony, Officer Davis stated that the man was sweating and breathing heavily. The officers asked for identification, but the individual did not have any. The officers patted the man down and did not recover anything. The man was later released. Officer Davis resumed searching the area and found shell casings on the side of apartment complex 4511, and observed several bullet holes in the wall and windows of apartment complex 4513.
Approximately ten minutes after the gunshots were heard, Officer Davis saw D.A.D. on his tiptoes "in a semi-crouch position" moving up the steps that he and Sergeant Perrin had descended earlier.[2] D.A.D. was approximately thirty-five yards from Officer Davis and was carrying a light shirt and dark cap, the same clothing that the officer believed the first suspect who fled was wearing. Officer Davis testified that he was suspicious of D.A.D. because in his experience suspects often change their clothes after committing a crime. Officer Davis asked D.A.D. to stop and come over to him. D.A.D. moved the clothing from his left hand to his right hand, and placed his left hand in his left pants pocket. The trial court found that the reason D.A.D. placed his hand in his pocket was to provide Officer Davis with the identification he requested.[3] When D.A.D. placed his hand in his pocket, Officer Davis pulled out his gun and told D.A.D. to remove his hands from his pocket.[4] Officer Davis repeated this command three times before D.A.D. complied.[5]
Officer Davis and D.A.D. conversed and moved toward each other at the officer's request. D.A.D. responded that he knew he had been stopped because of the sound of the gunshots. The Officer walked D.A.D. to the side of the building and ordered D.A.D. to place his hands against the wall. D.A.D. put one hand up against the wall and then lowered the other hand to his side and repeated this gesturing several times. Officer Davis ordered *1155 D.A.D. to give him his coat, and in response, D.A.D. threw it on the ground several feet away. When the officer reached to get the coat, D.A.D. placed his left hand back in his left pocket and began to "fidget." Officer Davis then slapped D.A.D.'s hand away and grabbed D.A.D.'s left pants pocket. Officer Davis felt a pistol in the pocket and quickly placed D.A.D. on the ground. The gun was removed from D.A.D.'s pants pocket and he was arrested. Officer Davis testified that he did not believe that D.A.D. had a gun until he actually felt the pistol in his pocket.

II.
After reviewing the record, we agree with the government that the police officer had reasonable articulable suspicion to stop and frisk D.A.D. In reviewing a motion to suppress, we view all of the facts and reasonable inferences in a light favorable to sustaining the trial court's rulings. See Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted). We defer to the trial court's findings of fact and we will not disturb the trial court's factual findings unless they are clearly erroneous. See Lawrence v. United States, 566 A.2d 57, 60 (D.C.1989). However, we review the trial court's conclusions of law de novo, see Holt v. United States, 675 A.2d 474, 478 (D.C.), cert. denied, 519 U.S. 866, 117 S.Ct. 176, 136 L.Ed.2d 117 (1996), and whether there was sufficient reasonable suspicion to validate the officer's conduct is a matter of law which this court must decide. See Green v. United States, 662 A.2d 1388, 1389 (D.C. 1995). Moreover, reasonable suspicion to stop an individual is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence...." Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). Finally, certain factors considered separately may seem innocent; however, this court has announced that taken together they may provide sufficient articulable suspicion. See Peay, 597 A.2d at 1320.
On appeal, the government asserts that the trial court erred in suppressing the evidence because there was reasonable suspicion to stop and frisk D.A.D. To prove that the officers reasonably stopped D.A.D., the government must "point to specific articulated facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. 1868. In order to determine whether a search and seizure is reasonable, there needs to be a dual inquiry into "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 19-20, 88 S.Ct. 1868.
In Anderson v. United States, 658 A.2d 1036, 1038 (D.C.1995), this court articulated that to justify a Terry stop or a search for weapons, factors a court should consider include, but are not limited to: (a) time of day, (b) flight, (c) high crime and nature of the location, (d) furtive hand movements, (e) informant's tip, (f) a person's reaction to questioning, (g) a report of criminal activity, and (h) viewing of an object or bulge indicating a weapon. These factors are to be considered as part of the trial court's assessment of the totality of the circumstances. See Peay, 597 A.2d at 1320. Each factor assists in determining whether there were articulable facts, but they are not elements of a conjunctive test, nor is any one factor outcome determinative. Thus, whether all of the Anderson factors are met does not completely measure whether the totality of circumstances establishes reasonable suspicion. See id.
To determine whether there was reasonable suspicion to stop D.A.D., we evaluate each factor individually and then as a whole to determine whether the combination of facts establishes the grounds for articulable suspicion. See id. *1156 We also view the situation through the lens of a reasonable police officer, guided by his training and experience. See Green, 662 A.2d at 1390. In the instant matter, the following Anderson factors support a finding of reasonable suspicion: (1) Officer Davis was responding to a report of criminal activity and heard gunshots relating thereto, (2) the officers were directed to a specific location where the shots were fired, and (3) it was approximately 11:00 p.m. at night. Additional factors also support a finding of reasonable suspicion: (4) D.A.D. was found walking near the crime scene not long after the crime had been committed; (5) D.A.D. was carrying clothes similar to a suspect who had previously fled the scene minutes before;[6] and (6) D.A.D. was observed by Officer Davis tiptoeing in a suspicious semi-crouched position.
D.A.D. argues, and the trial court agreed, that there were insufficient facts which justify the stop because many of the above-mentioned Anderson factors were not met. However, as we have said, the factors listed in Anderson are not part of a conjunctive test. In Anderson a police officer encountered the appellant in a high crime area late at night. 658 A.2d at 1037. The officers, however, were not responding to a specific report of criminal activity, but happened to see Anderson and a companion in an alleyway. When Anderson saw the police, he quickly moved away from his companion. When the officer stopped and questioned Anderson, he acted nervously and placed his hand in his coat pocket after the officer asked him to remove his hands from his pockets. The officer did not see anything on Anderson's person that indicated he had a weapon. This court reasoned that the appellant's furtive movement, reluctance to remove his hands from his pocket, and unusual manner were insufficient to establish articulable suspicion, and held that the stop and subsequent frisk of Anderson was unreasonable.
In the instant case, however, additional factors warranted the stop of D.A.D. Importantly, the officers heard gunshots from where they were located and then responded immediately to a report of recent gunshots in the rear of the apartment complex at 4511 South Capitol Street. Additionally, D.A.D. was carrying clothes similar to those worn by the man who initially fled from the crime scene that the officers suspected to have been involved in the gunfire. Moreover, when the officers initially encountered D.A.D., he was crouched over and tiptoeing near the scene of the crime in a suspicious manner, seemingly engineered to avoid the police. Thus, in reviewing the totality of the circumstances, the confluence of the police officers' response to gunfire, the nighttime encounter with D.A.D., who was observed in the same area carrying clothes similar to those of a suspect who had fled the scene after being approached by the officers, and D.A.D.'s suspicious gait, are sufficient articulable facts to warrant the Terry stop.
The purpose of a frisk under Terry is to ensure the safety of the officer and the public from individuals that have been stopped and may reasonably be perceived by the officer to be dangerous. Thus, to determine whether the frisk was reasonable, this court has held that in the course of a lawful stop, police officers may conduct a reasonable search for weapons where there is reason to believe that the officer is dealing with an armed and dangerous individual. See United States v. Mitchell, 293 U.S.App.D.C. 24, 28, 951 *1157 F.2d 1291, 1295 (1991). In doing so, the court must consider the totality of the circumstances and not view each act in a vacuum. See Peay, 597 A.2d at 1320. Ultimately, "in the case of the self-protective search for weapons, the [officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron, 392 U.S. at 64, 88 S.Ct. 1889. Moreover, in reviewing the legality of such a search, the trial court objectively determines whether a reasonably prudent officer in that circumstance would be warranted in the belief that his safety or that of others was in danger. See id. at 27, 951 F.2d 1291. Hence, the subjective thoughts of the officer do not necessarily invalidate the objective reasons supporting the stop and frisk. See Whren v. United States, 517 U.S. 806, 813-14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[7]
Officer Davis and Sergeant Perrin were (1) responding to a radio transmission of gun activity in the area; (2) it was at night; (3) they had recovered shell casings in the area and observed several bullet holes in the wall and windows of apartment complex 4513; (4) they saw D.A.D. moving in a suspicious manner near the scene; (5) they had reason to believe that D.A.D. may have been involved in the gunfire; and (6) although justified in initially reaching in his pockets to provide identification, D.A.D. was subsequently unwilling to comply with multiple police requests to remove his hands from his pockets, and continued to reach for his left pocket after being told by the officer to put his hands on the wall. The combination of these factors provides sufficient information for a reasonable officer to believe that D.A.D. may have been involved in the gunfire and perhaps in possession of a firearm at the time. The objective factors in this case provide sufficient information for an officer to conduct a limited pat-down search for his own safety, and thus, warrant the frisk for weapons after D.A.D. was stopped. Accordingly, the motion to suppress should have been denied, and the order of the Superior Court is reversed. The case is remanded with direction to the trial court to deny D.A.D.'s motion to suppress.
So Ordered.
NOTES
[1] The trial court found that the transmission connection was poor, and consequently it was unclear whether the officers received a description of a black male standing by the dumpster before arriving at the scene.
[2] The trial court found that D.A.D. was walking in this manner to avoid the police because he had a gun on him, not because he was responsible for the earlier shooting to which the police were responding. However, this reason offered by the trial court also supports the reasonableness of the officers' decision to stop and frisk D.A.D.
[3] The trial court credited all of Officer Davis' testimony except for the issue of whether he asked D.A.D. for identification when they initially made contact. The trial court credited D.A.D.'s testimony as to this issue.
[4] The trial court found that the officer had seized D.A.D. at the point where Officer Davis drew his gun.
[5] D.A.D. testified that he kept his hand in his pocket searching for his school identification.
[6] Officer Davis had reasonable suspicion to stop the first person encountered at the scene because flight implies a consciousness of guilt. See United States v. Johnson, 496 A.2d 592, 597 (D.C.1985) (holding that "flight from authority  implying consciousness of guilt-may be considered among other factors justifying a Terry seizure"). Because Officer Davis saw D.A.D. within ten to fifteen minutes after he saw the first person flee, carrying similar clothes, it was reasonable to suspect that D.A.D. may be the same person. In any event, D.A.D.'s suspicious movement as he approached the stairs in the area of the gunfire provides independent articulable suspicion to justify his stop and frisk.
[7] The trial court, although ruling that the initial stop was illegal, seemed to find important that at the point where Officer Davis pulled his gun on D.A.D., the officer stated: "I did not think that he had a gun, I was wondering why he was going in his pocket... actually, a gun was the last thing on my mind." However, as we stated before, in reviewing the validity of a subsequent search under Terry, the subjective thoughts of the officer are irrelevant because the test is an objective one. See Whren, 517 U.S. at 813-814, 116 S.Ct. 1769.