Juan Ramon UMANZOR, Appellant,*

v.

UNITED STATES, Appellee.

No. 99–CF–463.

District of Columbia Court of Appeals.

Argued Oct. 31, 2001.

Decided July 25, 2002.

---

* The record reflects that Mr. Umanzor is also known as Edwin Flores. However, since he signed his name while under oath on his Criminal Justice Act Eligibility Form as Juan Ramon Umanzor, we will refer to him using this name.

Andrea Roth, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief for appellant.

Maria N. Lerner, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Mary–Patrice Brown, and Steven J. Durham, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellant Juan Ramon Umanzor was charged with one count of First–Degree Murder While Armed (Premeditated), D.C.Code §§ 22–2401, –3202 (1996 Repl.), and one count of Carrying a Dangerous Weapon (CDW), D.C.Code § 22–3204(a) (1996 Repl.) in the stabbing death of Herman Blanco. His first trial on these charges, which took place in March 1998, ended in a hung jury with respect to the murder count. Appellant's second trial took place in December 1998, and the jury returned guilty verdicts on both counts. He was subsequently sentenced to thirty years to life on the murder count and one to three years on the CDW count, to be served consecutively. He appeals his convictions, arguing that (1) his motion to suppress physical evidence was improperly denied because his vehicle was illegally stopped; (2) the police lacked probable cause to arrest him and to seize physical evidence from his vehicle; and (3) the trial court improperly granted the government's motion in limine, which prevented

him from arguing to the jury that the unidentified DNA on the murder weapon, the knife blade, belonged to Jose Andrade, who appellant contends was the actual murderer. We affirm.

## I.

During the early morning hours of June 23, 1996, appellant and Herman Blanco were involved in an altercation which culminated in the stabbing death of Blanco. Jose Alberto Garcia, decedent's friend, and Jose Vanagas, decedent's cousin, were eyewitnesses to the events leading to Blanco's death. Both testified that they, another man, and Blanco left the Don Juan Restaurant, located on the corner of Mount Pleasant and Lamont Streets, between 2:20 a.m. and 2:30 a.m., and headed in the direction of Garcia's truck, which was parked around the corner from Lamont Street. As they crossed Lamont Street, they saw appellant and two other men, one of whom was Jose Andrade, outside of the restaurant.

Garcia testified that appellant and his two companions were outside on the corner of Seventeenth and Lamont Streets drinking and "looking for problems." Appellant made a provocative statement, and Garcia responded that they were "not looking for problems." Garcia then saw appellant take a swing at Blanco. Blanco defended himself by punching appellant in his mouth, which began to bleed. Appellant then ran to his car and retrieved a knife from underneath the driver's seat. Both Vanagas and Garcia then saw appellant removing the knife from its packaging and running towards Blanco, who was in the process of entering Garcia's vehicle. Garcia and Vanagas warned Blanco, who then ran towards the side door of the restaurant. He was unable to enter because that particular door had been locked, and was subsequently stabbed in the chest

by appellant. Blanco then ran to the front entrance of the restaurant and fell inside.

Immediately after the stabbing, Garcia heard appellant tell his companions in Spanish, "Let's go because I already killed him," and Vanagas heard a comparable statement.[1] Garcia then saw appellant run towards his car and jump over the hood into the driver's seat, and his companions joined him. Garcia also testified that he "stayed there [after appellant fled] asking for help so that they could be caught." Both Garcia and Vanagas identified appellant in photo arrays the next morning, as well as in-court identifications, and both testified that appellant had long black hair, a bloody lip and was wearing a white sleeveless T-shirt and blue jeans.

Garcia also testified as to the description of the suspect's vehicle that he communicated to police officers following the incident. In response to questioning by defense counsel, he testified that he initially thought the dark blue Honda was gray:

Q. Now sir, after the stabbing you saw the person who did the stabbing going to a blue car, right?

A. Yes.

Q. And that is this blue car in Government's Exhibit Number Twelve, correct?

A. Yes.

Q. Now that night you described that car as a gray car, right sir?

A. Yes.

In addition to Garcia and Vanagas, Officer Emiliana Rodriguez and Officer Ruben Vargas, two off-duty police officers, also testified to witnessing the stabbing incident. While Officer Rodriguez was speaking to Officer Vargas outside of a nearby restaurant, she heard glass breaking and what sounded like arguing in Spanish. When she looked in that direction, she saw a Hispanic man crossing the street, and two to three other Hispanic males chasing him. The man being chased was overtaken at the side door of the restaurant by a Hispanic male with long black hair wearing a sleeveless white T-shirt. The two then began to struggle. Officer Rodriguez then saw the individual in the sleeveless white T-shirt make an arm movement. His two companions then approached him and all three spoke before crossing the street. She then saw the man wearing the sleeveless white T-shirt jump over the hood of a car into the driver's side.[2] She attempted to make a U-turn in order to see the vehicle's tag number, but it passed too quickly before proceeding in an eastbound direction on Lamont Street. Soon after the stabbing and while still at the crime scene, she was approached by Vanagas, who recognized her as an officer who worked in the area. He informed her that appellant had offended Blanco, and that Blanco had punched appellant in the mouth in self-defense.

Officer Vargas testified that he heard what he thought was arguing coming from the direction of the corner of Seventeenth and Lamont Streets. He then saw someone running from the corner into the restaurant. At first, the individual attempted to enter the restaurant through the side door, was unable to do so, but eventually entered through the front door. Believing there had been an argument, the officer followed this individual into the restaurant and, upon entering, saw Blanco lying on the floor just inside. Initially, because it was dark inside the restaurant, Vargas thought Blanco had been punched. In the

---

1. Vanagas heard appellant say "let's go, I already hit him."

2. Officer Rodriguez identified the car which the three males entered when presented with a photograph during trial.

process of helping to move him outside for air, Vargas saw blood coming from Blanco's chest area, thought he might have been stabbed, and asked a friend to call for assistance. As people were coming out of the restaurant, someone kicked an object that emitted a metallic sound. When Vargas looked over, he saw that the object looked like a knife blade.

During the defense case, both appellant and a witness testified that it was Jose Andrade, not appellant, who was responsible for the stabbing. Appellant called Edwin Ramone Flores, a lifelong friend, who testified that Blanco walked up to appellant while he was entering his car and hit him. Andrade, who was wearing a white sleeveless T-shirt and blue jeans similar to that worn by appellant and apparently seeking revenge on appellant's behalf, then followed Blanco and stabbed him on the sidewalk on Lamont Street.[3] Flores then saw Blanco walk towards the restaurant and fall by the entrance. By the time that Andrade stabbed Blanco, appellant was already at his car. Andrade then walked to appellant's car, and entered the back seat of the two-door vehicle from the driver's side. Flores also testified that he never saw any blood on Andrade's clothing or face.

Appellant testified that on the night of the stabbing he arrived at the Don Juan Restaurant at approximately 12:20 a.m. with four friends, including Jose Andrade. At approximately 2:20 a.m., he left the restaurant with Andrade and two other friends in order to take Andrade home. Upon reaching his blue Honda Prelude, he saw Blanco asking Andrade for a cigarette. When Andrade refused to give him one,

Blanco approached him and grabbed a cigarette out of his hands. After appellant told Blanco not to "look for trouble," Blanco approached appellant and hit him on the lip, which began to bleed. Appellant testified to being stunned by the punch, but denied responding in any way. He then saw Andrade jump over the hood of the Honda, open the driver's side car door, retrieve appellant's knife, follow Blanco, and stab him at the kitchen entrance of the restaurant. Andrade then ran back to the vehicle, jumped over the hood, and entered by the back seat. Appellant testified that during the stabbing, Andrade was wearing a sleeveless white T-shirt like his own and blue jeans but, unlike appellant, had long curly hair rather than long straight hair. Appellant indicated that he had purchased the knife used in the stabbing, which he kept underneath the passenger seat, in order to cut a portion of carpet that had become unglued in his car, and was certain that Andrade had become aware of the knife's presence there from sitting in the back seat. Appellant then drove towards Maryland in order to drop off Andrade, and was subsequently stopped by police. By that point appellant had taken off his T-shirt to put over his bleeding lip. Appellant testified that he did not see any blood or injuries on Andrade on the night of the stabbing.

At the hearing on the motion to suppress the physical evidence and at trial, Officer Steven Reid, an officer on the Metropolitan Police Department (MPD) for seven years, testified that at approximately 2:45 a.m. he received a lookout broadcast for "a two door old Honda, gray in color, occupied one or two times, in reference to a homicide stabbing."[4] "Two sec-

---

3. Flores testified that Andrade had a striped shirt in his hands while stabbing Blanco, and that Andrade put that shirt on over his sleeveless white T-shirt after the stabbing.

4. According to the transcript of the radio-run, the lookout was actually for "a gray two-door Honda, nothing additional other than occupied once or twice. Last seen in the area of

onds" later, while he and his partner were on the 200 block of Missouri Avenue, N.W., he saw a car he thought "kind of matched the lookout" about one block from the Maryland state line at a time when there "wasn't a lot of traffic." He immediately turned his police cruiser around in order to stop the vehicle and investigate. The officer indicated that initially he thought the Honda was gray, but upon positioning his police cruiser behind it, he realized it was blue.

Officer Reid testified extensively as to the circumstances which led him to stop a blue two-door Honda carrying three individuals despite the lookout for a gray two-door Honda containing one or two individuals. He testified that at the same time that he recognized the color discrepancy, he also noticed a large dark T-shirt on the trunk of the vehicle and that the vehicle was driving "real slow" or "cautiously":

Q. Now, the lookout broadcast—you got a general lookout for a gray two-door Honda, nothing additional other than occupied once or twice; last seen in the area of Mt. Pleasant and Lamont in reference to the stabbing; isn't that right?

A. That's correct.

Q. Now, the car that you stopped was a dark blue Honda; correct?

A. Yes.

Q. And Officer Reid, in fact, before you stopped it, you knew that that car was a blue car; correct?

A. Initially when I saw it, no.

Q. But before you actually activated your emergency lights and stopped the car, you knew that that car was blue; right?

A. Yes.

Mount Pleasant and Lamont, reference to a

Q. And before you stopped the blue car, you could see that there were three occupants in the car; correct?

A. Yes.

. . . .

THE COURT: ... You get a lookout for a gray Honda and you stop a blue Honda. Why did you stop it?

THE WITNESS: Like I stated when I first saw the car initially, it appeared to be gray. It was dark. It appeared to be gray. By the time I got—turned my vehicle around and got up on it directly behind it, I noticed it was a dark blue.

THE COURT: Why did you therefore stop it?

THE WITNESS: Because he was driving real slow and there was a shirt on the back and so I thought I would just investigate it.

[By Defense Counsel]

. . . .

Q. And so it was when you were approaching the car that you noticed the shirt; is that right?

A. When I got directly behind it, yes, I noticed the shirt.

Q. And when you were directly behind the car, you had already activated your lights; correct?

A. No, I didn't—when I first got behind it, I didn't just turn on my lights.

When the officer approached the driver's side of the vehicle, he looked inside with a flashlight and saw that appellant had a cut lip, was shirtless, and had blood on his chest and his pants. Upon asking the three occupants to step out of the car and shining his flashlight inside, he could see a knife handle on the back seat and a bloody white T-shirt on the floorboard be-

stabbing."

hind the driver's seat. He also observed what appeared to be fresh blood on the hood and bumper of the vehicle. When he saw the physical evidence, he notified the detectives on the case, and he was advised to transport the occupants to the police station.[5] At trial, Officer Reid recognized a photo of Jose Andrade as one of the individuals in the back seat, and testified that he did not see any blood or facial injury on Andrade that night.[6]

The motions judge denied the motion to suppress the physical evidence. Although skeptical, the judge found the lateness of the hour could justify the color discrepancy.[7] However, crucial to the motions court's decision was the officer's observation of the dark shirt on the back of the car. Ultimately, the court ruled that the investigative stop was legal on the basis of traffic safety concerns:

> ... It seems to me ... [that the critical evidence is] the shirt or cloth that is sitting on the back of the car while it's moving along. I mean, frankly, I think

that any officer in the District of Columbia who saw a car driving along a public street with some sort of shirt or cloth sitting on the trunk of the car would have a right to stop the car. The car presents a hazard in that situation. I mean, that cloth can blow back into somebody's windshield and it can cause all kinds of problems .... [i]t's not probable cause to arrest or stop the guy for some kind of traffic offense. It's a reason to stop the car to avoid a potential hazard to the driving public.

The government filed a motion in limine to prevent appellant from arguing that Andrade was the source of the unidentified DNA found on the knife blade.[8] The trial court concluded that since there was no evidence on the record that Andrade had been injured, allowing argument that would have the jury infer that Andrade was the source of the unidentified DNA would be too speculative: "[t]here wasn't a sufficient factual foundation for the inference and ... you can't draw inferences

5. The transcript of the radio-run reflects that Officer Reid told the dispatcher that he had "a Honda stopped at Riggs and Oglethorpe," provided tag numbers, and indicated that the vehicle was occupied by three Hispanic males. He also told the dispatcher that he had "three suspects with blood on them up here. When we get some units that are on the scene of the homicide, have them swing on up."

6. Detective Lazaro Gonzalez also testified that *he did not see any blood on Andrade after he* and the others were brought to the police station.

7. During the suppression hearing, the motions judge discussed the color discrepancy at length:

> the misidentification of the color of a car is a bit more excusable in the dark hours of evening than it is in the bright light of day ... [W]hile Officer Reid initially thought [the car] ... was gray, he finally realized it was blue and so he stopped the blue car

realizing he had a lookout for a gray car, but the circumstances that he initially thought the car was gray, it seems to me suggests that other persons who might have seen the car in a different part of the city that night again in the dark hours of the evening could have concluded it was gray because here we have an officer who to all appearances is reliable and credible and says: Gee, my initial impression of this car was gray until I got right up close to it. Well, that suggests that the officers who gave the lookout ... might have mistaken the color, just as Officer Reid did. And of course, didn't have the chance of Officer Reid to get close and right up on the vehicle to see what the color was.

8. Thomas F. Callaghan, a forensic DNA examiner with the Federal Bureau of Investigation, testified that there was DNA on the knife blade from at least two individuals. Although Blanco could be the source of one of the DNA profiles found on the blade, appellant could not be the source of the other DNA profile found there.

without facts to support them. That's just speculation, and I'm not going to permit it."

## II.

Appellant challenges the denial of his motion to suppress the physical evidence, arguing that such evidence was recovered during an illegal investigative stop. Three grounds are advanced for the illegality of the stop: the police lookout was overly broad, the source of the lookout was never determined, and the stop was not made on the basis of a reasonable and articulable suspicion of criminal wrongdoing or that appellant had committed a traffic offense.

 Our review of the denial of a motion to suppress physical evidence requires that we view "the facts and all reasonable inferences therefrom ... in favor of sustaining the trial court ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991). We must "ensure that the trial court ha[d] a substantial basis for concluding that no constitutional violation occurred." *Thompson v. United States,* 745 A.2d 308, 312 (D.C.2000) (citations omitted). The trial court's determination as to whether the officer had reasonable suspicion justifying the investigative stop pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) is a mixed question of law and fact. *Speight v. Unit-*

ed States, 671 A.2d 442, 446 (D.C.), *cert. denied,* 519 U.S. 956, 117 S.Ct. 375, 136 L.Ed.2d 264 (1996). On appeal, we defer to the trial court's factual findings unless clearly erroneous, and make an independent legal assessment as to whether there was reasonable suspicion for the stop. *Id.* Although we agree with the trial court's conclusion concerning the legality of the *Terry* stop, we uphold that legal conclusion on other grounds. *See Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986) ("It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court"). In affirming the legality of the *Terry* stop, we do not assign, as the trial court did, dispositive weight to any one fact in the record.[9] *See Gomez v. United States,* 597 A.2d 884, 891 (D.C.1991) ("[T]he correctness of the legal characterization of the facts appearing in the record is a matter for this [c]ourt to determine").

### A. The Terry Standard—Reasonable Suspicion and the Totality of the Circumstances

 The Fourth Amendment prohibits police officers from seizing persons absent a "reasonable, articulable suspicion that criminal activity is afoot." *Speight, supra,* 671 A.2d at 446 (citing *Terry, supra,* 392 U.S. at 30, 88 S.Ct. 1868).[10]

---

9. Since, as will be shown, we can sustain the stop under traditional fourth amendment analysis, we need not reach the issue whether, as the motions judge appeared to conclude, the community caretaker exception would justify the stop, perhaps a somewhat difficult proposition. *See Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (the police act as community caretakers only when their conduct is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" such as when they respond to accidents, nuisances, or to vehicles that constitute public safety hazards).

10. Clearly, appellant was seized for purposes of the Fourth Amendment once Officer Reid put on his emergency lights signaling appellant to stop and appellant complied therewith. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("The Fourth Amendment applies to seizure of the person, including brief investigatory stops such as the stop of [a] ... vehicle"); *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("a person is 'seized' only when ... his freedom of movement is restrained" and a reasonable person would not have believed he was free to leave).

"[S]ome minimal level of objective justification" is required for a seizure, *Thompson, supra,* 745 A.2d at 315 (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)), and "an inchoate and unparticularized suspicion or 'hunch' " does not meet that standard. *Terry, supra,* 392 U.S. at 27, 88 S.Ct. 1868; *In re T.L.L.,* 729 A.2d 334, 340 (D.C.1999) (citations omitted). Thus, the officer effectuating the seizure is required to indicate "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry, supra,* 392 U.S. at 21, 88 S.Ct. 1868. The reasonableness of the stop "turns on the facts and circumstances of each case." *Mendenhall, supra* note 10, 446 U.S. at 561, 100 S.Ct. 1870 (Powell, J., concurring); *see also Gomez, supra,* 597 A.2d at 889 (" 'case matching' is of limited utility in Fourth Amendment analysis of street encounters between citizens and police officers, for 'two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second' ").

Justice Powell has indicated that an assessment of reasonableness should be informed by "(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise." *Mendenhall, supra* note 10, 446 U.S. at 561, 100 S.Ct. 1870 (Powell, J., concurring); *see also Maryland v. Wilson,* 519 U.S. 408, 411, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ("reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers") (citations and internal quotation marks omitted); *In re T.T.C.,* 583 A.2d 986, 989 (D.C.1990) (noting that the Supreme Court has recognized that the "balancing of competing interests" is the key principle of the Fourth Amend-

ment and, thus, "the determination of whether police behavior is supported by a reasonable and articulable suspicion of criminal activity lies in a comparison between the degree of police intrusion and the level of police justification") (internal citations omitted).

■ The requirement of reasonable suspicion is not "an onerous one" since it is "substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence." *In re T.L.L., supra,* 729 A.2d at 339 (citations omitted). However, the reasonable, articulable suspicion must be "particularized as to the individual stopped." *Id.* at 340. Thus, "a description applicable to large numbers of people will not suffice to justify the seizure of an individual" when "other circumstances that provide sufficient particularity" are lacking. *Id.* Our analysis must focus on whether the "facts available to the officer at the moment of the seizure ... warrant a man [or woman] of reasonable caution in the belief that the action taken was appropriate." *Carr v. United States,* 758 A.2d 944, 946–47 (D.C. 2000) (citing *Terry, supra,* 392 U.S. at 22, 88 S.Ct. 1868).

■ We assess the lawfulness of *Terry* stops by considering "the totality of the circumstances," "the whole picture":

Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.... [This] analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and

deductions that might well elude an untrained person.

*Cortez, supra* note 10, 449 U.S. at 417–18, 101 S.Ct. 690; *see also Mayes v. United States*, 653 A.2d 856, 864 (D.C.1995) ("the whole may sometimes be more than the sum of its parts"). Moreover, innocent individual acts or circumstances do not rule out a finding of reasonable suspicion:

> Even if each specific action of appellant was of itself susceptible of an explanation consistent with innocence of [criminal conduct], the observing police officer may see a combination of facts that make out an articulable suspicion.

*(William) Brown v. United States*, 546 A.2d 390, 393 (D.C.1988) (citation omitted); *see also Gomez, supra*, 597 A.2d at 890 (the *Terry* standard does not require that an officer "rule out the possibility of innocent behavior, for suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity") (citation and internal quotations omitted). *But see Duhart v. United States*, 589 A.2d 895, 899 (D.C.1991) ("If the behavior of a subject is capable of 'too many innocent explanations,' then the intrusion cannot be justified").

■ The record before us indicates that on June 23, 1996 at approximately 2:45 a.m., Officer Reid received a lookout broadcast for a "a gray two-door Honda, nothing additional other than occupied once or twice. Last seen in the area of Mount Pleasant and Lamont, reference to a stabbing." The officer was aware that the stabbing had taken place approximately twenty-five minutes earlier. "Two seconds" after hearing the lookout, Officer Reid saw appellant's vehicle, which he initially believed matched the lookout description in certain respects. Upon getting behind the vehicle, the officer realized that due to the nighttime conditions he had mistaken appellant's dark blue Honda for a gray one. However, he then observed that the vehicle was proceeding "real slow" or "cautiously" and that a dark-colored T-shirt was appended to the trunk. The officer also testified that traffic was light at that hour, and that appellant's vehicle was approximately one block away from the border between the District of Columbia and Maryland. Based on these observations, Officer Reid concluded that he should investigate.

Although this case is a close one, we conclude that under the totality of the circumstances, the information available to Officer Reid at the time he stopped appellant's vehicle was sufficient to establish a reasonable suspicion that appellant was connected with the homicide stabbing. While we have recognized that "there are limits to the inference[s] that an experienced reasonable police officer can rationally draw," *Duhart, supra*, 589 A.2d at 899, for the reasons discussed below, we do not believe that the officer here drew unreasonable inferences in concluding that the vehicle he was observing warranted investigation.

■ When assessing the totality of the circumstances, we have held that a court should consider various factors including, but not limited to "the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and the viewing of an object or bulge indicating a weapon." *Anderson v. United States*, 658 A.2d 1036, 1038 (D.C. 1995). Although each factor is useful in determining whether there were articulable facts justifying the stop, these factors "are not elements of a conjunctive test," and no one factor is "outcome determinative." *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C.2000). The totality of the circum-

stances may establish reasonable suspicion despite the fact that all of the factors are not met, and additional circumstances may also be considered. *Id.* at 1156.

Under our facts, two of the *Anderson* factors—the time of day and that the stop was made in response to criminal activity—support a finding of reasonable suspicion. *See Anderson, supra,* 658 A.2d at 1038. The stop of appellant's vehicle was made at approximately 2:45 a.m.—hardly an hour when Hondas of the type described in the lookout are ubiquitous on our city streets as appellant argues. In addition, the stop was made in response to a report of criminal activity that had taken place approximately twenty-five minutes earlier.

In addition to the two *Anderson* factors and the similarities between the lookout description and appellant's vehicle in terms of its make, model and, at first glance, color, the reasonableness of the *Terry* stop is also supported by the additional observations made by the officer. When explaining his decision to stop appellant's vehicle, Officer Reid made specific references to the fact that the vehicle was being driven "real slow" or "cautiously" and that a dark T-shirt was appended to the trunk.[11] Although both observations in themselves reflect arguably innocent conduct, we may factor them into our calculus in determining whether the officer had reasonable suspicion to justify the investigative detention. *See Thomas v. United States,* 553 A.2d 1206, 1208 n. 9 (D.C.1989) (recognizing that "suspicious behavior can support police intervention even if some innocent explanations for it cannot be ruled out"). Moreover, the reasonableness of the stop was also supported by the fact that appellant was stopped approximately

twenty-five minutes after the stabbing and only seconds following the lookout broadcast when appellant was one block from the Maryland border. *See Cox v. United States,* 256 A.2d 917, 918 (D.C.1969) ("The emergency nature of the situation confronting the officers is also a factor that may be considered in determining whether the arrest was proper. Had the officers waited for further details about the suspect before taking action, the automobile ... may well have made its escape into another part of the city or another jurisdiction").

Since we must consider the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *Green v. United States,* 662 A.2d 1388, 1390 (D.C.1995), we conclude that Officer Reid's observations met the requirements of a reasonable suspicion justifying an investigative detention. Under the circumstances here, the officer's decision to stop appellant's vehicle "in order to determine his identity [and] ... maintain the status quo momentarily while obtaining more information" was certainly reasonable given the information available to the officer at the time. *See Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The similarities between the lookout and the suspect's vehicle in terms of make and model; the fact that Officer Reid was responding to the report of a stabbing that had taken place twenty-five minutes earlier; the officer's belief that the dark blue vehicle was gray during nighttime conditions; the fact that the officer saw appellant's vehicle seconds after the lookout was broadcast, during the early morning hours when traffic was light, and one block from the Mary-

---

11. The record does not indicate, as appellant contends, that the officer stopped the vehicle based solely on the lookout description.

land border; and the officer's additional observations that a dark T-shirt was on the vehicle's trunk and that the vehicle was being driven "cautiously," certainly were not the type of observations and ambiguities that should have caused a responsible officer "to shrug his shoulders and allow ... a criminal to escape" by eschewing further investigation. *See id.* at 145, 92 S.Ct. 1921; *see also Carey v. United States,* 377 A.2d 40, 44 (D.C.1977) ("we do not hold reasonable action impermissible simply because, in retrospect, an alternative is preferred"). Rather, the officer faced circumstances during a "swiftly developing situation" which warranted the minor intrusion of an investigative detention in order to dispel his suspicions. *See United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *see also Upshur v. United States,* 716 A.2d 981, 984 (D.C.1998) (*Terry* permits " 'freezing' the situation very briefly while an ongoing and fast moving situation was

clarified"); *Turner v. United States,* 623 A.2d 1170, 1173 (D.C.1993) (citing *Sharpe, supra,* 470 U.S. at 686, 105 S.Ct. 1568) (Our determination of whether the officer's conduct was reasonable is informed by whether the police are acting in a "quickly developing situation," such circumstances being the type that argue against courts "indulg[ing] in unrealistic second-guessing of the police officer's judgment").

Thus, after viewing the whole picture, we conclude that the lookout description, Officer Reid's observations, and his inferences from the same were sufficient to support a reasonable, articulable suspicion that appellant's vehicle was the one wanted in connection with the stabbing. The officer's observations and concomitant suspicions based on those observations certainly exceeded the "inchoate and unparticularized suspicion or 'hunch,' " *see Terry, supra,* 392 U.S. at 27, 88 S.Ct. 1868 which will not support an investigative stop.[12]

12. *See Carr, supra,* 758 A.2d at 947 (no reasonable suspicion based on fact that appellant was seen standing on the other side of an individual smoking marijuana, looked at police, placed his hand in his pocket and then stuck his head in open window of car as if he were having a conversation with occupants); *In re T.L.L., supra,* 729 A.2d at 340 (no reasonable suspicion when two of a group of about five or ten suspects detained about an hour after the robbery at a location four blocks from scene of a crime when suspects matched a description which could have fit many or most young black males); *In re D.T.B.,* 726 A.2d 1233, 1236 (D.C.1999) (fidgeting with waistband and nervousness does not rise to reasonable suspicion); *In re R.M.C.,* 719 A.2d 491, 496 (D.C.1998) (walking very close to others, nervousness and clutching one's side are insufficient to establish reasonable suspicion particularly since the officer was not responding to a report of criminal activity and saw no bulge indicating the possible possession of a weapon); *Green, supra,* 662 A.2d at 1390 (report of dispute involving guns and gunshots at some unspecified time in the general area of seizure, appellant's pocketing of a small, dark object and

his avoidance of police not sufficient to justify *Terry* stop); *Anderson, supra,* 658 A.2d at 1040 (*Terry* stop not justified because appellant seen in a high crime area, late at night, acted nervously and placed his hands back in his coat pocket after being asked to remove them when being questioned by officers); *In re A.S.,* 614 A.2d 534, 538–40 (D.C.1992) (*Terry* stop of minor not justified based on fact that there were at least five others in the area who fit the broadcast description, police knew that minors in the area wore similar clothing, and there was no evidence of flight); *Cauthen v. United States,* 592 A.2d 1021, 1023–24 (D.C. 1991) (no reasonable suspicion when informant's tip only indicated that three or four people were present at 14th and Buchanan Streets selling drugs and police arrival at location came fifteen minutes later); *Brown (Marvin) v. United States,* 590 A.2d 1008, 1019 (D.C.1991) (no reasonable suspicion when discrepancy between lookout description and suspect as to height, as well as lettering and color of shirt, and only meaningful similarity between the two is that the suspect is a black male); *Duhart, supra,* 589 A.2d at 899 (fact that an experienced officer observed two peo-

The facts here indicate that the officer was possessed of "the minimal level of objective justification which would warrant a brief detention of the occupants of the vehicle[] so that the police could investigate further." *Gomez, supra,* 597 A.2d at 890 (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)) (internal quotation marks omitted).

### B. Specificity and Source of Lookout, Time Lapse

Appellant argues that the lack of specificity in the lookout description should render illegal any investigative detection made in reliance upon it. However, we conclude that the description was reasonably detailed as to the color, make and model of the vehicle (a gray, two-door Honda) given that the lookout was broadcast during the early morning hours, the dark blue vehicle appeared gray during nighttime conditions according to the testimony of both Officer Reid and Garcia, and the officer saw the vehicle "two seconds" after the broadcast. As discussed above, vehicles of that make and model are hardly common during the early morning hours when the city streets are nearly deserted. Thus, there was no potential for the "dragnet seizure" against which the Fourth Amendment was designed to protect. *See United States v. Turner,* 699 A.2d 1125, 1130 (D.C.1997).

We have recognized that "the more the description provided . . . can be said to be particularized, in the sense that it could apply to only a few persons in the relevant universe, the better the chance of having at least sufficient grounds to make a stop." *Id.* at 1129 n. 3. The "relevant universe" as

determined "by the amount of time which had passed since the offense," approximately twenty-five minutes here, and that the lookout was broadcast during the early morning hours when traffic was light supported the officer's reasonable suspicion that the Honda he observed "two seconds" after hearing the lookout was connected to the stabbing homicide. *See id.* at 1130 ("The relevant universe . . . as indicated . . . by the amount of time which had passed since the offense . . . and the number of people . . . in that area to whom the description applied narrowly circumscribed the discretion of the police in making a seizure") (internal quotations omitted). The officer was hardly faced with a description that was so vague that it could encompass multiple vehicles at 2:45 a.m. Of course, the officer's subsequent observations upon seeing appellant's vehicle—that there was a dark T-shirt on the trunk and that the car was being driven "real slow" or "cautiously"—contributed to enhancing his suspicions that investigation was appropriate.

With respect to appellant's argument that his vehicle "differed substantially" from the lookout description, the trial court correctly recognized that the time of night should be taken into account when determining whether the color discrepancy between the lookout description and appellant's vehicle should invalidate the stop. We have recognized that a mistake regarding an item's color when "observations occurred in the early hours of the morning under artificial lighting conditions" would not be deemed fatal where points of similarity exist. *Brown (Marvin), supra* note

---

ple examining "something" and concluded that a narcotics transaction had taken place insufficient to establish reasonable suspicion); *Smith v. United States,* 558 A.2d 312, 314 (D.C.1989) (en banc) (fact that appellant engaged in conversation with known drug deal-

ers, the neighborhood was a high narcotics trafficking area, knowledge that drugs sales are often made in a team, and appellant merely attempted to leave hurriedly when police appeared does not rise to reasonable suspicion).

12, 590 A.2d at 1019 (citations omitted). Moreover, Officer Reid could have reasonably inferred that if he initially believed that the dark blue vehicle was gray, the individual or individuals providing the lookout information also made the same error in the darkness.[13] *See Groves v. United States,* 504 A.2d 602, 604 (D.C. 1986) (officer's error in believing that a Chevrolet was a Pontiac was an error that the informant could have also made upon observing the vehicle because the two models are similar). Thus, we conclude that the color discrepancy is not dispositive in our assessment of the legality of the *Terry* stop, particularly in view of the fact that the lookout was not the sole basis for the officer's decision to effectuate the stop.

Relying principally on *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), appellant argues that the *Terry* stop was invalid because no evidence was presented concerning the source of the lookout description in order to determine its reliability.[14] This argument is without merit. Even if the government had failed to definitively establish the source of the lookout, we have recognized that "the absence of direct proof of the source of lookout information is not a ground for suppression ... [when the] source may be proved inferentially." *Carey, supra,* 377 A.2d at 45 (citations omitted). In *Carey,* the court believed that one of the victims must have been the lookout source, and concluded that "it is

apparent that the officers ... were acting on eyewitness information within a few moments of the offense." *Id.* From the record before us, it is equally apparent that the likely source of the information concerning the color and other characteristics of the vehicle came from Garcia, who was an eyewitness to the stabbing and testified that he initially thought the Honda was gray, presumably accounting for the color discrepancy between the lookout description and the actual color of appellant's car.

Appellant also argues that the time lapse between the stabbing and the stop—approximately twenty-five minutes—is a sufficient basis to invalidate the *Terry* stop. However, the cases cited by appellant for this proposition are all distinguishable. Those cases involve police response times to locations based on anonymous informants' tips and, consequently, are not analogous to the facts before us. *See Cauthen, supra* note 12, 592 A.2d at 1023; *Brown (Marvin), supra* note 12, 590 A.2d at 1017–18; *Speight, supra,* 671 A.2d at 448; *Holston v. United States,* 633 A.2d 378, 381 (D.C.1993); *Gomez, supra,* 597 A.2d at 889.[15]

## III.

Appellant also challenges the legality of his arrest, arguing that Officer Reid did not have probable cause to arrest him and thus acted illegally when the officer

---

**13.** Garcia, a government witness who was present during the stabbing, also testified that he initially believed that the car was gray.

**14.** *Whiteley, supra,* 401 U.S. at 567–68, 91 S.Ct. 1031 involves the impermissible reliance on an uncorroborated informant's tip as the basis for an arrest warrant, the substance of which was then communicated to another county police department that ultimately arrested the appellant there, and is thus not factually analogous to the record before us.

**15.** Appellant's argument that the legality of the stop was also undermined by "the innocuous reaction of the occupants" of the vehicle to Officer Reid's approach is also without merit. While we have recognized that under particular circumstances flight from police officers reflects consciousness of guilt, *see In re T.L.L., supra,* 729 A.2d at 341–42, we have never recognized that the failure to flee reflects innocence.

"searched" his car, seized physical evidence, and transported him to the police station.[16] We conclude that when Officer Reid observed the knife handle and bloody T-shirt in plain view, as well as what appeared to be blood on the hood and bumper of the vehicle, he had probable cause to arrest appellant and to seize the physical evidence.[17]

"Generally, probable cause exists where the facts and circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." *Rucker v. United States,* 455 A.2d 889, 891 (D.C. 1983). The requirement of probable cause to justify the seizure of physical evidence has long been deemed "a flexible, common-sense standard," which "merely requires that the facts available to the officer would warrant a ... [person] of reasonable caution in the belief that certain items may be contraband or stolen property *or useful as*

*evidence of a crime." Texas v. Brown, supra* note 17, 460 U.S. at 742, 103 S.Ct. 1535 (citations and internal quotation marks omitted) (emphasis added). Whether probable cause exists is a mixed question of law and fact in which legal questions predominate and, consequently, this court reviews the trial court's legal determinations *de novo* while our review of the underlying facts is deferential. *Prophet v. United States,* 602 A.2d 1087, 1091–92 (D.C.1992).

Although the Fourth Amendment is violated when property is seized in the absence of a warrant issued on the basis of probable cause, the plain view doctrine serves as one exception to this requirement by allowing the warrantless seizure of evidence observed in plain sight when: (1) an officer does not "violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) the evidence's "incriminating character" is "immediately apparent";[18] and (3) the officer has "a lawful

16. Appellant argues that probable cause was lacking for substantially the same reasons upon which he challenges the *Terry* stop: because (1) the lookout description could not be relied upon as evidence in the probable cause analysis because the government failed to establish the reliability of the source of the broadcast; (2) even if the reliability of the lookout had been established, the lookout description differed substantially from appellant's car; and (3) there was a significant time lapse and distance between the incident and the stop.

17. Appellant argues that the officer lacked probable cause to "search" appellant's vehicle for the knife blade and bloody T-shirt. However, the record clearly indicates that the officer saw the items in plain view during the course of the investigative stop and, thus, no search was either required or effectuated to recover the physical evidence. *See Horton v. California,* 496 U.S. 128, 134, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("If 'plain view' justifies an exception from an otherwise applica-

ble warrant requirement ... it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches"); *see also Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (police conduct that enables an officer to observe the interior of a suspect's car is not deemed a search as understood under the Fourth Amendment); *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plain view doctrine applies "where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object").

18. The incriminating nature of the evidence will be based on the circumstances of the case. *See Childress v. United States,* 381 A.2d 614, 618 n. 4 (D.C.1977) (case suggests that items seen in plain view—tape player, citizens' band radio with cut wires, bent coat hanger, screwdriver, and wire cutters—constitute "incriminating evidence" the nature of which is "immediately apparent" because of-

right of access to the object itself." *Horton, supra* note 17, 496 U.S. at 136–37, 110 S.Ct. 2301. "The information obtained as a result of observation of an object in plain sight may be the basis for probable cause" justifying police "access to a particular item." *Texas v. Brown, supra* note 17, 460 U.S. at 739 n. 4, 103 S.Ct. 1535. Thus, "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Id.* at 739, 103 S.Ct. 1535. Such a "seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable,* assuming that there is probable cause to associate the property with criminal activity." *Id.* at 741–42, 103 S.Ct. 1535 (citations omitted) (emphasis in the original); *see also Crawford v. United States,* 369 A.2d 595, 601 (D.C.1977) ("A seizure from an automobile of an object [of an incriminating nature] in plain view by an officer who was lawfully in a position to observe the object is a recognized exception to the Fourth Amendment's search warrant requirement").

■ The requirements of the plain view doctrine were clearly met here. First, after effectuating a lawful *Terry* stop in response to a stabbing twenty-five minutes earlier and seeing that appellant had blood on his chest and pants and a bloodied lip, it is indisputable that the officer had a legitimate reason for asking appellant and his companions to step out of the vehicle. Consequently, when the occupants stepped out, the officer was legally standing in a position to view the items on the floorboard and the back seat. Second, the "incriminating character" of the knife handle and bloody T-shirt was "immediately apparent" given that the officer was responding to a lookout broadcast for a stabbing suspect. Third, Officer Reid had a lawful right to seize the evidence because the nature of the items—a knife handle and a bloody article of clothing—connected appellant with the offense. *See Horton, supra* note 17, 496 U.S. at 136–37, 110 S.Ct. 2301. Subsequently, the officer saw what appeared to be blood on the bumper and hood of the vehicle. The information obtained from the lookout in combination with the physical evidence seen in plain view are more than adequate to warrant Officer Reid to reasonably believe that appellant and the physical evidence were connected to the stabbing.[19] Thus, we conclude that the officer had both probable cause to arrest appellant and to seize the evidence.

## IV.

In his final challenge, appellant argues that the trial court erred in granting the government's motion in limine, which sought to prevent appellant from asking the jury to infer that Andrade was the source of the unidentified DNA detected

ficers were assigned to work in an area experiencing a high rate of vehicle larcenies involving audio equipment).

19. Appellant relies on Officer Reid's call to the police dispatcher after stopping appellant's vehicle as an indication of the officer's awareness that he lacked probable cause to arrest appellant. The record reflects that upon stopping the vehicle, the officer contacted headquarters, indicated that he and his partner had stopped the Honda at Riggs and Oglethorpe, supplied the tag numbers, and indicated that the vehicle was occupied by three Hispanic males, one of whom was bloody. The officer also requested that someone at the scene of the homicide respond to his location. Subsequently, the officer was asked to bring the suspects to the police station. Rather than reflecting the officer's awareness that he lacked probable cause, a more reasonable interpretation of the record is that he was acting out of an abundance of caution by determining whether additional information was available and requesting further instructions.

on the knife blade used to stab Blanco. Such an error constitutes a violation of the Sixth Amendment and warrants reversal, appellant argues, because he was prevented from presenting "a point essential to the defense" which could be reasonably inferred from the evidence. The government counters that the trial court correctly granted its motion because there was no evidence in the record to support the inference that appellant would have the jury draw.

 During closing arguments, the parties may "make reasonable comments on the evidence" and "argue all reasonable inferences from the evidence adduced at trial." *Clayborne v. United States,* 751 A.2d 956, 969 (D.C.2000) (internal citations and quotation marks omitted). However, counsel are not permitted to "go beyond reasonable inferences and engage in impermissible speculation." *Id.* Determining whether counsel's statements reflect "a reasonable inference or impermissible speculation . . . is usually a task best suited to the trial judge, who is on the spot and has a vantage point superior to ours." *Gardner v. United States,* 698 A.2d 990, 1001 (D.C.1997) (internal quotation marks omitted); *see also Hagins v. United States,* 639 A.2d 612, 617 (D.C.1994) ("An evidentiary ruling by a trial judge on the relevancy of a particular item—and hence the extent to which its meaning may be argued to the jury—is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse") (internal quotation marks omitted).

 Here, the trial court ruled that allowing appellant to ask the jury to infer that the unidentified DNA on the knife blade was Andrade's would amount to "asking the jury to draw inferences that the evidence simply would not bear." *See Clayborne, supra,* 751 A.2d at 969 (citations omitted). We conclude that the trial court did not abuse its discretion in so ruling. There is simply no evidence in the record that Andrade sustained any injuries or that he was bleeding on the day of the stabbing warranting an inference that the unidentified DNA could have been his. Without such evidence, an inference that the unidentified DNA was Andrade's would have been based on pure speculation. The record reflects that multiple witnesses—government witnesses Officer Reid and Detective Gonzalez, as well as appellant and defense witness Flores—testified that they did not see any injuries or blood on Andrade on the night of the stabbing.

Appellant relies on *United States v. De Loach,* 164 U.S.App. D.C. 116, 504 F.2d 185 (1974) to support his claim that the trial court abused its discretion in granting the motion in limine. That case's recognition of a defendant's constitutional "right to have his theory of the case argued vigorously to the jury" does not imply that the trial court should permit inferences which have no basis in the record. *See id.* at 164 U.S.App. D.C. at 120, 504 F.2d at 189 ("present[ing] facts or representations of fact *dehors* the record . . . would of course be impermissible").[20] Appellant

---

**20.** The other cases cited by appellant relevant to this issue support the same proposition. *See Irby v. United States,* 464 A.2d 136, 140 (D.C.1983) ("It is fundamental that . . . [during closing, counsel] is entitled to make reasonable comments on the evidence and [urge] such inferences from the testimony as will support his theory of the case"); *United States v. Sawyer,* 143 U.S.App. D.C. 297, 298–99,

443 F.2d 712, 713–14 (1971) (indicated in dicta that the trial court abuses its discretion when it "prevents defense counsel from making a point essential to the defense," and that "[t]he court should exclude only those statements that misrepresent the evidence"); *Wesley v. United States,* 233 A.2d 514, 517 (D.C. 1967) ("In summation to the jury[,] counsel are allowed wide latitude in commenting

was never precluded from advancing his theory that Andrade was the one who stabbed Blanco. Indeed, defense counsel's closing statement is replete with references to the defense theory that Andrade, not appellant, stabbed Blanco to death, and the trial court permitted a jury instruction based on this defense.[21] And unlike *De Loach*, where the trial court concluded that "the record contained sufficient support for [the] ... inferences" the appellant there had attempted to make at trial, *id.* at 164 U.S.App. D.C. at 121, 504 F.2d at 190, the trial record here does not support the inference that the unidentified DNA found on the knife blade belonged to Andrade.[22]

For the foregoing reasons, the decision of the trial court is

*Affirmed.*

upon the evidence. Closing arguments must nevertheless be confined to comments on the testimony of record and any reasonable inferences to be drawn therefrom and where, as here, the bounds of proper argument are exceeded the court is obliged to take corrective action").

21. The defense jury instruction was as follows:

> The defense in this case is that Jose Andrade on his own stabbed the Decedent after the Decedent grabbed a lighter and cigarette from Andrade, and after the Decedent had hit [appellant] ... in the mouth. [Appellant] ... was standing by his car at the time that Andrade followed the Decedent and stabbed him, thus it is the Defense position that the Government's witnesses mistakenly identified [appellant] ...

22. Appellant also argues that in *Morris v. United States*, 564 A.2d 746 (D.C.1989), this court allowed inferences to be made during closing argument that were more speculative than the ones being pressed here. There, we affirmed a trial court ruling in which the government asked jurors to "use your imagination" as to the contents of a conversation that took place between appellant and two others who had allegedly planned to gang rape appellant's co-worker. *Id.* at 750. In *Morris*, however, we construed the prosecutor's use of the phrase "use your imagination" to connote that the content of the conversation "could be gathered by reasonable inference" because the record included uncontested evidence that the three co-defendants had a conversation prior to the rape, and there was substantial evidence that the sexual assaults took place immediately thereafter. *Id.* There, again, we recognized that "[o]f course, in the absence of supporting evidence, the prosecutor's remark would have been speculative," "any remark inviting inferences by the jury must be based on and manifestly linked to evidence presented in open court," and that parties "may not argue facts not in evidence" *Id.* at 750–51.